578 A.2d 513

**COMMONWEALTH of Pennsylvania**

v.

**Christopher WRIGHT, Appellant.**

Superior Court of Pennsylvania.

Argued June 19, 1990.

Filed Aug. 1, 1990.

Petition for Allowance of Appeal
Denied Jan. 24, 1991.

Joseph M. Devecka, State College, for appellant.

W. Jeffrey Yates, Asst. Dist. Atty., W. Bellefonte, for Com.

Before CIRILLO, President Judge, and CAVANAUGH, BROSKY, ROWLEY, MONTEMURO, BECK, TAMILIA, POPOVICH and JOHNSON, JJ.

CIRILLO, President Judge.

Christopher Wright appeals from the judgment of sentence entered by the Court of Common Pleas of Centre County following his convictions for two counts of possession with intent to deliver marijuana, and two counts of delivery of marijuana. 35 P.S. § 780–113(a)(30). We vacate the judgment of sentence.

Ken Doran and appellant Christopher Wright attended Penn State University in 1982 and were in the same physics class. They also worked together in 1984 at the Saloon, a restaurant/bar located in State College. In March of 1985, Doran was arrested by the local and campus police for selling cocaine. On March 29, 1985 Doran signed a plea agreement with agents of the Commonwealth in which he agreed to help gather information concerning drug dealing on the Penn State campus in exchange for a probationary sentence. The agreement stated that Doran was aware that the Centre County District Attorney's Office, the University Police Services, and the DEA reserved the right to indicate their approval of the agreement until Doran "fully cooperated."

Doran came into contact with Wright a few months later. Wright invited Doran to visit his apartment.[1] Doran had not taken any action to satisfy his plea agreement between March 29 and the beginning of July and when he ran into Wright he decided to cultivate a friendship in order to persuade Wright to purchase marijuana for him. Doran

1. Doran admitted that when he ran into Wright he did not have any indication that Wright was involved in drugs. He also stated that he called Wright later that month because he "was getting pressure from the police, the university police, just reminding me what I was here for, that I was suppose to be—to act as an informant, and let's get moving. And, I thought well—let's see what kinds of leads we have. And at that point Chris was the only real person I had known in State College that *I thought I had a chance of doing anything with.*" (emphasis added)

visited Wright's apartment several times between July 8 and August 30 of 1985. Doran either called Wright prior to stopping at Wright's apartment or just stopped by. Doran occasionally brought beer with him and generally stayed for an hour or two. During the visits Wright and Doran often played games such as Yahtzee and Rummy, drank beer, listened to music, and smoked marijuana.

On August 29, 1985, Doran was made aware that his plea bargain was not going to be approved because he had not "fully cooperated" with the agents of the Commonwealth. Thereafter, Doran contacted Police Officer Ronald Schreffler and told him that Wright was an individual from whom Doran thought he could purchase marijuana. Officer Schreffler testified that he and Doran then placed a phone call to Wright during which Doran attempted to set-up a drug transaction. The set-up, however, was unsuccessful. On August 30, 1985, Officer Schreffler again dialed Wright's residence and Doran asked to meet with Wright. The purpose of the meeting was for Doran to give Wright the $40.00 he had received from the police to enable Wright to purchase two ounces of marijuana. Doran met with Wright, gave him the money, and made arrangements to meet again later that day to pick up the marijuana. Doran stated that the police were aware of all of his actions; "they took charge of the whole thing.... They made up the lies and I told them to fool [Wright] I suppose, to go along with the guise that I was just some innocent person."

On September 11, 1985, a similar meeting was set up when Officer Schreffler placed a call to Wright's residence and Doran requested to meet with Wright for the purpose of purchasing marijuana. Again the transaction took place in two steps; first Doran gave Wright the money and later that day they met to enable Wright to give Doran the drugs. This time, however, Doran was given $42.00 by the police, two dollars representing the money which he would give Wright for gasoline expenses.

On September 18, 1985, a third meeting was set up by the police, through Doran, to identify Wright's source of mari-

juana and to enable Doran to meet with Wright's source. Doran and Wright got into Wright's car and drove to Kenneth Stouffer's house in Milesburg. On their way, they stopped for gas and sodas for which Doran paid. After the two men entered Stouffer's house, Wright asked Stouffer if he could get Doran some marijuana, and Stouffer went downstairs and brought up a bag of marijuana. Doran gave Stouffer $150.00 for a half pound of marijuana. Upon leaving Stouffer's residence, Doran asked Stouffer if he could continue to do business with him; Stouffer responded yes and told Doran not to call him directly but to call Wright.

Again, on October 3, 1985, Officer Schreffler placed a call to Wright's residence. Doran spoke with Wright and made arrangements for Wright to purchase some marijuana for Doran. Officer Schreffler gave Doran $280.00 to purchase a pound of marijuana. Officer Schreffler and Agent Albert R. Lumpkin, Jr., a narcotics investigator employed by the Pennsylvania Office of Attorney General, then drove him to a location near the area where he was to meet Wright. Doran and Wright travelled in Wright's vehicle to Stouffer's residence. They stopped on their way to Stouffer's to buy gas and sodas. Again, Doran paid. Once at Stouffer's, Doran was permitted to go downstairs to the basement where he saw a room filled with marijuana plants. Doran then purchased a pound of marijuana for $280.00. After leaving the Stouffer residence, Doran gave the marijuana to Agent Lumpkin. After each of the incidents, Doran gave a taped statement. Wright was arrested and thereafter was tried before a jury on April 23, 1986.

The aforementioned discussion details the nature and sequence of the events which transpired. However, also relevant to our disposition of this case is the testimony that illustrates the extent of the police department's involvement and the nature of the relationship between Wright and Doran.

For example, on cross-examination, Officer Schreffler testified that Doran was acting as an informant. He also

admitted that he decided to have Doran fabricate a story about working at the University so that Wright would have to go on campus to meet Doran to obtain the money for the marijuana.

In addition, Agent Lumpkin testified that Doran was not charged with possession of marijuana because "he was my informant or our informant, law enforcement agent." Agent Lumpkin, an agent of the Commonwealth, testified that he had agreed to allow Doran to act as an informant. He also testified that he was aware that each time Wright drove Doran to Stouffer's residence, Doran gave Wright money for gas. Agent Lumpkin also stated that he initially was not aware that Doran was fronting the money to Wright and that he preferred not to front money but if it was the only method of accomplishing the transaction, he would permit it.

Moreover, Thomas P. King, a criminal investigator with the State College Bureau of Police Services, testified that he had worked in drug enforcement and with the Penn State University Police. On cross-examination, Investigator King referred to Doran as "the informant" when he was explaining that Doran introduced King to Stouffer.[2] King also stated that Doran was advised to tell Wright that he worked at the University to provide Doran with an excuse for not initially accompanying Wright to obtain the marijuana and to enable the police to control where Doran and Wright would meet to exchange the money and marijuana.

In addition, Doran testified that on August 30, he asked Wright if he could purchase two ounces of marijuana and Wright responded that he would look into it but that he probably could obtain it. Doran stated that during his phone conversations with Wright, Wright never indicated that he did not want to sell him the marijuana. On cross-examination, Doran admitted that he told Wright he had to

2. Investigator King was introduced to Stouffer to allow King to purchase marijuana from Stouffer. King stated that because "the informant had gained the trust of Stouffer, it was not difficult for [King] to make a buy from Stouffer."

work, did not have much free time, and that as a result, Wright was doing him *a favor* by going to purchase the marijuana for him. He also stated that he had to give Wright the money to enable Wright to obtain the marijuana. Doran also stated that Wright's name did not appear on a list of the persons with whom he had drug deals prior to March 29, 1985; a list which he had given to the police. Doran testified he wanted Wright to *"think of him as a friend"* and that Wright introduced him to other persons as *his friend.* Doran also recounted that he and Wright smoked marijuana together at Wright's apartment. Doran stated that he *intentionally acted as Wright's friend* between July 8 and August 30 *to get Wright to purchase marijuana.* Doran also stated that he continued to visit Wright even after October 3rd, the last time Wright took Doran to Stouffer's house. Doran testified that Wright did not make any money on the transactions and that Wright drove Doran to Stouffer's because Doran asked him to do so and because Wright believed he had no other way of getting there. Doran stated that he was continuously trying to give Wright the impression that he was *his friend.*

In his own defense, Wright testified that he ran into Doran in the beginning of July and that Doran "started to buddy up to me." He stated that Doran visited once or twice a week, stayed about an hour or two and occasionally brought a six pack of beer. Wright also testified that he introduced Doran to his friends. Wright also stated that he purchased the marijuana for Doran because Doran told him that he had to work. He agreed to pick up the marijuana for Doran because "he was *my friend* and it was *a favor."* He also stated that he did not ask Doran for compensation on August 30 because he "thought it was a one-time only thing, it was *a favor to a friend."* Wright testified that on September 11, Doran came to Wright's apartment to give him the money to get the marijuana and that the reason Doran could not accompany him to get the marijuana was because he had to work. He also stated that the reason he drove Doran to Stouffer's was because Doran told him that

he did not have a car. Furthermore, he stated that he did not touch the marijuana or the money when he was at Stouffer's on September 18 or October 3.

On cross-examination, Wright admitted that his fraternity brothers often came to his apartment to smoke marijuana that he provided to them as friends. He stated that he viewed smoking marijuana as a social activity. He admitted that there was some sort of trust between himself and Stouffer. Wright did not dispute the occurrence of the transactions. He stated that he drove back and forth to Milesburg because of *his friendship with Doran*. Wright never specifically told Doran that he was not going to get him marijuana. He stated that he did not sell Doran marijuana, he only bought it for him. In return for driving four hours and approximately 120 miles, Wright testified that he received nothing other than gas and two cartons of lemonade.

Following trial, the jury found Wright guilty of two counts of possession with intent to deliver in connection with incidents occurring on August 30, 1985 and on September 11, 1985, and two counts of delivery of marijuana in connection with an incident occurring on September 11, 1985. He was found not guilty of two counts of conspiracy to deliver marijuana. On April 26, 1986, Wright filed timely post-trial motions requesting a new trial because the trial court erroneously denied his jury instructions. In addition, he requested that the judgment against him be arrested because the conduct of Doran constituted entrapment as a matter of law. These motions were denied in an opinion and order by the Honorable Charles Brown, Jr., President Judge of the Court of Common Pleas of Centre County.

Wright filed a motion for probation without verdict pursuant to 35 P.S. § 780–117. Judge Brown granted a rule upon the Centre County District Attorney to show cause why Wright's motion should not be granted. Thereafter the Commonwealth filed an answer to Wright's motion for probation without verdict. Wright's motion was denied and on November 10, 1987, Judge Brown entered two orders

placing Wright on probation in lieu of sentence on both convictions.[3]   This appeal followed.

Wright raises the following issues for our consideration:

1.  Must the defendant receive a new trial due to the failure of the trial court to give any one of the defendant's requested jury instructions on the defense of consent.

2.  Must the defendant receive a new trial due to the failure of the trial court to instruct the jury as requested in Instruction No. 2, as modified that in considering the entrapment defense, Ken Doran was a Commonwealth agent.

3.  Was the conduct of the police and Ken Doran concerning Christopher Wright, entrapment as a matter of law requiring arrest of judgment.

Because we find that Wright's third issue is meritorious and requires vacatur of his judgment of sentence, we address only that issue.

Wright argues that he was entrapped as a matter of law and consequently contends that his judgment should be arrested.  He asserts that the Commonwealth should not be permitted to use the bonds of friendship to induce the purchase of marijuana.

The Commonwealth, on the other hand, states that Doran's social meetings with Wright were merely part of the strategy generally employed in undercover drug investigations.   Moreover, the Commonwealth notes that it merely offered Wright the opportunity to commit the crimes as he was already predisposed with the intent to sell and deliver controlled substances as evidenced by his friendship with Stouffer, the man from whom he purchased the marijuana for Doran.   The Commonwealth concludes that there was no evidence presented to clearly establish entrapment as a matter of law.   We disagree.

---

**3.**  Although the orders of sentence are dated November 5, 1987, these orders are reflected as being entered on the docket on November 10, 1987.

Prior to addressing whether Wright was entrapped as matter of law, we will briefly examine the relevant law on entrapment. Entrapment is defined as:

(a) General rule.—A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by either:

(1) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

(2) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

(b) Burden of proof.—Except as provided in subsection (c) of this section, a person prosecuted for an offense shall be acquitted if he proves by a preponderance of the evidence that his conduct occurred in response to an entrapment....

18 Pa.C.S. § 313.

Recently our supreme court in *Commonwealth v. Weiskerger* and *Commonwealth v. Clapps*, 520 Pa. 305, 554 A.2d 10 (1989), considered whether 18 Pa.C.S. § 313 embodies an objective standard to a guide a fact finder in the application of the defense of entrapment. The court quoted at length from this court's decision in *Commonwealth v. Jones*, 242 Pa.Super. 303, 363 A.2d 1281 (1976), where we stated:

Prior to the adoption of the 1972 Crimes Code, the Pennsylvania test for entrapment was "... whether the criminal design was created by the officer or whether the officer merely afforded an opportunity for the commission of a crime by the person already disposed to commit the crime ..." ... This test was derived from the majority opinions in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), and *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), which focused on the predisposition of the accused to

commit the crime.... The present codification of entrapment finds its origin in Mr. Justice FRANKFURTER'S concurring opinion in *Sherman:* "This does not mean that the police may not act so as to detect those engaged in criminal conduct and ready and willing to commit further crimes should the occasion arise. Such indeed is their obligation. It does mean that in holding out inducements they should act in such a manner as is likely to induce to the commission of crime only these persons and not others who would normally avoid crime.... *This test shifts attention from the record and predisposition of the particular defendants to the conduct of the police and the likelihood, objectively considered, that it would entrap only those ready and willing to commit crime."* Thus, the test for entrapment has shifted in emphasis from a consideration of a particular defendant's readiness to commit crime, a subjective test, to an evaluation of the police conduct, an objective test, to determine whether there is a substantial risk that the offense will be committed by those innocently disposed. To determine whether an entrapment has been perpetrated in any particular case, therefore, the inquiry will focus on the conduct of the police and will not be concerned with the defendant's prior criminal activity or other indicia of a predisposition to commit crime.

*Weiskerger/Clapps,* 520 Pa. at 311, 554 A.2d at 13 (emphasis in original), citing *Jones, supra,* 242 Pa.Super. at 310–11, 363 A.2d at 1284–85. The court, thus, concurred in our interpretation of section 313 as set forth in *Jones* and unequivocally concluded that the "objective test represents the more enlightened approach and fosters the constitutional idea of equal justice for all." *Weiskerger/Clapps* 520 Pa. at 312, 554 A.2d at 14. The court noted that its conclusion was consistent with the legislative intent behind section 313 and opined that the burden of proof language in subsection (b) should not be read to indicate otherwise. *Id.* Subsection (b) was "merely intended to explicitly place the burden of proof on the defendant to establish the defense of

entrapment *as defined in subsection (a)* with its language focusing on the conduct of the police officers." *Id.* (emphasis in original).

Several cases decided prior to *Weiskerger/Clapps* are illustrative of this court's application of the objective test. For example, in *Commonwealth v. Stokes,* 264 Pa.Super. 515, 518, 400 A.2d 204, 206 (1979), we stated that when viewed objectively "the police conduct did no more than afford appellant an opportunity to make a sale of heroin [because] the undercover agent ... merely provided a market if appellant wished to sell." We stated the police conduct, that is, the actions of the deputy sheriff working undercover, was "not calculated to induce an innocent man to deal in heroin." *Id.,* 264 Pa.Superior Ct. at 518–19, 400 A.2d at 206. Accordingly, we found no entrapment. *Id.* at 518, 400 A.2d at 206. *See also Commonwealth v. Danko,* 281 Pa.Super. 97, 421 A.2d 1165 (1980) (court found that the evidence showed that the police officer merely provided appellant with the opportunity to commit the crime of prostitution, that the officer did not importune her to commit the crime, and that the officer's behavior would not have induced an innocent person to act as a prostitute, and thus the court concluded that the trial court properly found no entrapment as a matter of law.)

Moreover, in *Commonwealth v. Lee,* 262 Pa.Super. 218, 396 A.2d 724 (1978), we stated,

> Artifice and stratagem are legitimate tactics that may be employed by law enforcement officials to detect and combat crime. Merely affording opportunities or facilities for the commission of a crime by one who already had the criminal intent to engage in such a crime does not defeat the prosecution.

*Id.,* 262 Pa.Superior Ct. at 221, 396 A.2d at 725. There, we found no entrapment where an auxiliary policewoman acted as a decoy prostitute and did not initiate conversation with appellant potential customer, quote prices or suggest locations for the proposed work. *Id.,* 262 Pa.Superior Ct. at 222, 396 A.2d at 725.

Furthermore, in *Commonwealth v. Clawson,* 250 Pa.Super. 422, 378 A.2d 1008 (1977), a case factually similar to the case before us, appellant contended that the trial judge erred in refusing to instruct the jury on entrapment. We agreed and reversed appellant's conviction of delivery of marijuana and remanded for a new trial. *Id.,* 250 Pa.Superior Ct. at 426, 378 A.2d at 1011. There, a police informant asked appellant to obtain some marijuana for him, gave the appellant the money to purchase the drugs, and the appellant purchased the drugs for the informant. The appellant in *Clawson* had never been a drug dealer, did not make a profit on the deal, and testified that he delivered the marijuana only because the informant was a friend.[4]

In addition, this court sitting en banc in *Commonwealth v. McGuire,* 339 Pa.Super. 320, 488 A.2d 1144 (1985), reviewed the evolution of the defense of entrapment and noted that by enacting section 313 the legislature rejected the subjective standard that formerly comprised the entrapment defense.[5] *Id.* 339 Pa.Super. at 327, 488 A.2d at 1148. In *McGuire,* we stated,

> Pennsylvania's entrapment statute addresses the concern over 'unconventional' investigatory methods, and the *potentialities* inherent in these overreaching tactics. As such, the analysis only incidentally involves a particular defendant.[6]

\* \* \* \* \* \*

4. We note, as we did in *Commonwealth v. Taylor,* 299 Pa.Super. 113, 445 A.2d 174 (1982), that although this court in both *Lee, supra* and *Clawson, supra* purported to apply the objective test, it did consider the predisposition of the defendant.

5. We conducted this review in the context of our discussion of whether a criminal defendant should be required to admit every element of the offense with which he is charged before the entrapment defense will be available to him. *McGuire,* 339 Pa.Super. at 333, 488 A.2d at 1149.

6. We also stated that "a particular defendant's attitude is not relevant; he need not prove that he was not 'ready to commit the crime.' Rather, he must establish by a preponderance of the evidence that the methods of persuasion directed toward him, if utilized again, present a substantial risk that otherwise honest, law abiding citizens may at some time be ensnared. *McGuire,* 339 Pa.Super. at 328, 488 A.2d at 1148–49.

*... Official conduct designed to provoke criminal behavior, or which creates a substantial risk that unwitting citizens will be implicated in criminal schemes, should not be tolerated in Pennsylvania."*

*Id.,* 339 Pa.Superior Ct. at 328, 334, 488 A.2d at 1149, 1151 (emphasis added).

Thus, it is clear that this Commonwealth has adopted an objective standard for evaluating whether entrapment has occurred. Generally speaking, this standard is employed by the fact finder. Whether an "entrapment has occurred is a question for the jury, unless the evidence points to only one conclusion, in which case it may be decided as a matter of law." *Clawson, supra,* 250 Pa.Super. at 425–26, 378 A.2d at 1008, *citing Commonwealth v. Mott,* 234 Pa.Super. 52, 334 A.2d 771 (1975), (court held that as a matter of law the defense of entrapment was not available and should not go to the jury); *see also Weiskerger/Clapps, supra* (court stated that in order to prevail on a claim that the evidence demonstrated entrapment as a matter of law, appellants must show that the evidence was so overwhelming that it could admit no other conclusion and because appellants did not meet this standard, the court concluded that the question of whether the evidence demonstrated entrapment was one of fact and thus properly submitted to the jury); *Commonwealth v. Delligatti,* 371 Pa.Super. 315, 538 A.2d 34, *allocatur denied,* 520 Pa. 595, .552 A.2d 250 (1988) (court disagreed with appellant's contention that the detective's conduct amounted to entrapment as a matter of law where detective approached appellant, asked him to buy heroin for detective, and appellant readily accepted the proposition on five separate occasions without the detective's insistence); *Commonwealth v. Manley,* 252 Pa.Super. 77, 380 A.2d 1290 (1977) *vacated on other grounds* 491 Pa. 461, 421 A.2d 636 (1980) (where appellant acted as a middle man in several drug sales which were set-up by an informant who was a friend of appellant, court employed objective test, looked at the police conduct to determine if there was a substantial likelihood that the offense would be committed by one innocently disposed, stated that the evidence did not admit

of only one conclusion and concluded that the trial court was correct in presenting this issue to the jury); *Commonwealth v. Wright*, 235 Pa.Super. 289, 340 A.2d 544 (1975) (where the uncontradicted testimony revealed that *other* than the initial inquiry by police agent to appellant as to whether he had any cocaine to sell, all the affirmative action was at the insistence of appellant; the court found no misrepresentation, threat or coercion by the agent, stated that the asking of the initial question by the police agent did not amount to an inducement sufficient to dissuade an individual from his law abiding ways, and concluded that the trial court erred in holding as a matter of law that the police conduct constituted entrapment as a matter of law). Moreover, where there is conflicting testimony on the subject of inducement, the matter is properly left for the jury to resolve. *Commonwealth v. Cameron*, 247 Pa.Super. 435, 441, 372 A.2d 904, 907 (1977); *see also Commonwealth v. Berrigan*, 234 Pa.Super. 370, 343 A.2d 355 (1975).

Our review of the case law addressing entrapment as a matter of law leads us to conclude that based on an application of the objective test, the evidence admits of only one conclusion—that Wright was entrapped. We reach this conclusion by implementing the analysis utilized by this court in *Commonwealth v. Thompson*, 335 Pa.Super. 332, 484 A.2d 159 (1984), the leading case on entrapment as a matter of law. In *Thompson* we stated that once "the defense of entrapment has been properly established the trial court should determine the question as a matter of law wherever there is no dispute as to the operative facts relating to the defense." *Id.*, 335 Pa.Superior Ct. at 341, 484 A.2d at 164. There, we found that the appellant had properly established the defense because he had proven by a preponderance of the evidence that his conduct was in response to an entrapment.[7] *Id.*, 335 Pa.Superior Ct. at

---

7. We note that although the *Thompson* court stated that it must first determine whether the appellant has properly established the defense before determining whether the operative facts of the defense are in dispute, the court actually made its conclusion that the appellant had proven by a preponderance of the evidence that his conduct occurred

345, 484 A.2d at 166. We examined the testimony to determine whether there was any dispute as to the operative facts of the defense. We noted there that not only was the testimony regarding the course of dealings of the undercover agent who feigned a romantic interest in appellant, uncontradicted,[8] it was corroborated by the testimony of appellant.[9] *Id.*, 335 Pa.Superior Ct. at 341–42, 484 A.2d at 164. We stated:

> A careful review of the record in this case reveals no significant discrepancy in testimony of the Commonwealth's sole witness (Trooper Hammond) and of appellant regarding the course of conduct between the two over a ten month period. Appellant was a middle-aged black male and the trooper was a young, blonde, attractive female. A series of meetings and telephone calls occurred over a ten month period, all at the initiative of

in response to an entrapment on the basis of its finding that the testimony was unconflicting. *See Thompson*, 335, Pa.Super. at 345, 484 A.2d at 166.

**8.** We note that, initially, the court describes the testimony relating to the course of dealing between Trooper Hammond and appellant as "having no significant discrepancy" and later states the same testimony is "uncontradicted."

In a footnote the court explained that when the trial court rejected appellant's motion for new trial or motion in arrest of judgment, it stated that there was "some conflicting testimony regarding the extent of the parties' emotional involvement with each other and as to the effect this may have had on [appellant's] actions." The court went on to explain that this conflicting testimony was improperly considered by the trial court. The court stated that it would not address appellant's issue that the trial court erred in allowing the Commonwealth to elicit prejudicial, conjectural testimony from the Commonwealth witness. However, *in dicta*, the court stated:

> this conflicting testimony relates not to the trooper's conduct and appellant's response to it, but rather to the supposed *state of mind* of this particular appellant. By considering the testimony, the trial court focused subjectively on appellant's mental state and not on the conduct of the police as contemplated by the statute. Also, what appellant 'thought' and what Hammond supposed he 'thought' are not 'conflicting' but only different.

*Thompson*, 335 Pa.Super. at 341 n. 9, 484 A.2d at 164 n. 9.

**9.** The court stated "the testimony of [Trooper] Hammond and appellant corroborate each other, as both agreed to dates and locations of meetings, the clothes worn by [Trooper] Hammond on different occasions, the approximate time the kissing began, her repeated requests for drugs and the criticism."

Trooper Hammond. Drugs were constantly discussed. Although it is not always clear who brought the subject up on each occasion; what is clear is that beginning on September 29, 1980, Hammond began requesting drugs from the appellant. By early 1981, and perhaps earlier, Hammond began to chide and criticize appellant for his consistent failure to obtain or provide drugs. Beginning in late 1980 or early 1981, the two began kissing after each meeting. Hammond also permitted appellant to put his arm around her, walked around in public with him, and socialized with his friends.

*Id.*

The court then stated that the goal which the defense of entrapment seeks to establish is " 'public confidence in the fair and honorable administration of justice' " *id.*, 335 Pa. Superior Ct. at 342, 484 A.2d at 165, *citing United States v. Sherman*, 356 U.S. 369, 380, 78 S.Ct. 819, 824, 2 L.Ed.2d 848 (1958), and noted that the objective test is "aimed at condemning certain impermissible police conduct which, regardless of who may be induced to commit a crime, falls below standards to which common feelings respond, for the proper use of government power." *Thompson*, 339 Pa.Super. at 342, 484 A.2d at 165, *citing Sherman, supra*, 356 U.S. at 382, 78 S.Ct. at 825. Next, the court stated that although whether an entrapment exists must be evaluated upon the facts in each case, "impermissible [police] activity may include 'appeals to sympathy, *friendship*, the possibility of exorbitant gain, ...' 'extreme pleas of desperate illness, appeals based primarily on sympathy, pity or *close personal friendship*, and offers of inordinate sums of money.' " *Thompson*, 339 Pa.Super. at 343, 484 A.2d at 165 (emphasis added) (citations omitted).

In concluding that appellant was entrapped as a matter of law, the court in *Thompson* stated that the conduct of Trooper Hammond was not police conduct which presented the mere opportunity to commit a crime but instead constituted inducement. *Thompson*, 339 Pa.Super. at 344, 484 A.2d at 166. Moreover, the court distinguished the facts in *Thompson* from those in *Commonwealth v. Manley, su-*

*pra,* where appellant had acted as a middle man in several drug sales to an undercover agent; sales which were set up by an informant who was appellant's friend. The court in *Manley* found no entrapment as a matter of law thus disagreeing with appellant's contention that he was induced by the informant's request for drugs. The court based its finding on the fact that there was "no evidence indicating that the police were aware of the number or type of requests made by the informant, nor that the agent had encouraged the informant's repeated requests in order to wear down appellant's resolve." *Thompson,* 339 Pa.Super. at 343–44, 484 A.2d at 159, *citing Manley, supra* 252 Pa.Super. at 87, 380 A.2d at 1294. In *Thompson,* on the other hand, the evidence clearly demonstrated that the police were aware of Trooper Hammond's actions. The court stated "[n]ot only was Trooper Hammond obviously aware of her actions and of appellant's interaction with her, she also admitted to suspecting the effect her conduct was having on appellant, i.e., romantic or sexual desires." *Thompson,* 339 Pa.Super. 345, 484 A.2d at 166.

Wright, like the appellant in *Thompson,* has successfully invoked the defense of entrapment by proving by a preponderance of evidence that his conduct occurred in response to an entrapment. *Id.; see also* 18 Pa.C.S. § 313(b). Both Wright and the appellant in *Thompson* met this burden by the unconflicting testimony presented by the witnesses. Our review of the testimony reveals no dispute as to the occurrence of the transactions or the tactics employed by the police to lure Wright into participating in those transactions. Because there is no dispute as to the operative facts of the defense, we will, as we did in *Thompson,* determine whether the uncontradicted testimony establishes entrapment as a matter of law.

We are guided by our statements in *Thompson* where we acknowledged that impermissible police activity may include appeals to friendship. Here, Doran feigned friendship with Wright in order to manipulate him into purchasing marijuana as a favor to Doran. Doran, acting in cooperation with

the police, induced and encouraged Wright to purchase the marijuana for him. This inducement and encouragement was accomplished by Doran's deception of Wright. Doran purposefully appealed to Wright as a friend and Wright responded to Doran's requests for favors as would any friend. For "to friendship every burden's light." [10] The police, acting through Doran, induced Wright's conduct by fabricating the stories Doran told Wright in order to lead Wright to believe that Doran himself could not purchase the marijuana. Doran's appeals to friendship constituted methods of persuasion which created a substantial risk that Wright would, solely as a favor to Doran, purchase the marijuana. *See* 18 Pa.C.S. § 313.

The present case is distinguishable from those cases in which no entrapment as a matter of law was found. For example, in *Commonwealth v. Frank,* 357 Pa.Super. 442, 516 A.2d 64 (1986), we found that the issue of entrapment was properly submitted to the jury where a female undercover police agent posed as a patient who wished to control her weight and did no more than provide appellant physician with an opportunity to dispense medication. *Id.,* 357 Pa.Superior Ct. at 447, 516 A.2d at 67. We stated that she merely provided appellant with an opportunity to commit an illegal act by establishing an artificial doctor-patient relationship and did not persuade him or induce him to dispense drugs illegally. *Id.* "There is no evidence that she established or promised, expressly or by *implication,* any relationship other than that of patient and physician." *Id.* (emphasis added).

Clearly, such is not the case here. The testimony of both Wright and Doran illustrate that Wright's actions were made in response to Doran's implicit promise of friendship, not a professional doctor-patient relationship. For example, Doran testified that he feigned *friendship* in order to get Wright to purchase marijuana for him. Moreover, Doran's testimony is buttressed by Wright's testimony that he agreed to pick up the marijuana because Doran was his *friend* and it was a *favor.*

10. Gay–*The Hare with many friends.*

Furthermore, we, like the court in *Thompson*, find the facts in this case distinguishable from those in *Commonwealth v. Manley, supra*, where this court found that the trial court properly submitted the issue of entrapment to the jury. *Manley*, 252 Pa.Super. at 87, 380 A.2d at 1295. In *Manley*, although the evidence demonstrated that appellant told informant that he did not deal in drugs, and that he had no personal access to them, and that it was only after repeated telephone calls from the informant that he agreed to help obtain the drugs, it also revealed that the friendship between informant and appellant "was marked by only one social encounter in a bar, and ... there were no telephone calls and no visits by either of them to the other's home." *Id.*, 252 Pa.Superior Ct. at 86, 380 A.2d at 1294. The court noted that despite the appellant's claim that his sole motivation was friendship, appellant did admit to receiving profits from the drug transactions. *Id.*, 252 Pa.Superior Ct. at 87, 380 A.2d at 1294. In finding no entrapment as a matter of law, the court in *Manley* noted that even though the police were aware of the informant's friendship with appellant there was no evidence to establish that the police were aware of the type or number of contacts informant made prior to the first sale. Here, there were telephone calls and visits to Wright's home by Doran and Wright received no money for any of the transactions. Doran made the police aware of that he was cultivating a friendship with Wright during July and August.

In addition, this case differs from *Commonwealth v. Delligatti, supra.* There, a detective approached appellant and asked appellant to obtain heroin for him. Appellant readily accepted the proposition on five separate occasions without the detective's insistence. We stated that the conduct of the detective "was in no way calculated to induce an innocent person to deal with heroin," and concluded that appellant was not entrapped as a matter of law. *Delligatti*, 371 Pa.Super. at 324–25, 538 A.2d at 39. In *Delligatti*, unlike here, appellant was not doing a favor for a friend

when she purchased the heroin and retained some of the heroin from the transactions as a "copping fee."

Thus based on the aforementioned discussion we conclude that the trial court erred in submitting the issue of whether Wright was entrapped to the jury.[11] Doran, acting as a deputy of the police, rekindled a friendship with an unsuspecting Wright in order to further his own gain. The police, through Doran, employed tactics which created a controlled environment. In this environment, Wright acted as a good friend and demonstrated his friendship by doing favors for Doran. Doran used Wright and in the process abused a friendship that had flourished between them.

> A man that hath friends must show himself friendly; and true is a friend that striketh closer than a brother. Proverbs 18:24.

Judgment of sentence vacated.

CAVANAUGH, J., dissents.

CAVANAUGH, Judge, dissenting.

I respectfully dissent. The majority correctly states the rule that generally it is the fact finder which determines if entrapment has occurred, and that this issue may be decided as a matter of law only if the evidence points to one conclusion. It then goes on to state that the evidence, which is subject to different reasonable interpretations, leads to only one conclusion, namely that the appellant was entrapped.

In my opinion, the evidence raises a substantial factual issue as to whether the appellant was entrapped and the factual question clearly fell within the province of the jury. It seems to me that the majority has usurped the jury's

---

**11.** The trial court stated:

> In the instant case, the police used an informant who became friendly with defendant, visited defendant in his apartment on a few occasions at which times they drank beer and smoked marijuana, and subsequently, asked defendant to buy marijuana for him, which defendant did. The evidence does not show any resistance or apprehension on the part of defendant. *Cf. Commonwealth v. Thompson, supra.*

function by the simple expedient of determining as a matter of law what is clearly a question of fact.