662 A.2d 1

COMMONWEALTH of Pennsylvania

v.

Raymond LUCCI, Appellant.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Raymond LUCCI.

Superior Court of Pennsylvania.

Argued Dec. 14, 1994.

Filed June 28, 1995.

---

15. Our decision should not be construed as a condonation of the tactics employed by trial counsel in this case.

432

James J. Ross, Ambridge, for appellant.

Ahmed T. Aziz, Asst. Dist. Atty., Aliquippa, for Com., appellee.

Before DEL SOLE, FORD ELLIOTT and BROSKY, JJ.

FORD ELLIOTT, Judge:

This is an appeal from the judgment of sentence entered on May 23, 1994, in the Court of Common Pleas, Criminal Division, Beaver County. For the reasons set forth below, we vacate the judgment of sentence and find entrapment of the appellant as a matter of law. Because our vacatur moots the issue of the propriety of appellant's sentence raised by the Commonwealth, as well as the other issues raised by appellant, we do not reach those issues.[1]

1. Appellant raises seven (7) issues on appeal:
   I. Whether the verdicts on all charges should be set aside on the basis that defendant was entrapped as a matter of law;
   II. Whether the verdicts on the charges in the informations at Nos. 599 and 600 Pittsburgh 1992 should be set aside on the basis that the Commonwealth's evidence was so contradictory that it failed to establish these crimes beyond a reasonable doubt;
   III. Whether defendant should be granted a new trial on the basis that the trial court refused to admit mental health records of the informant, a key government witness, which contained his admissions of dishonest and deceitful conduct;
   IV. Whether defendant should be granted a new trial on the basis that the trial court refused to admit expert medical testimony

A brief review of the record is appropriate at this time. Following a trial by jury, appellant was found guilty of four out of five counts of possession, possession with intent to deliver, and delivery of a controlled substance.[2] The basis for appellant's conviction was a series of five cocaine sales to a paid government informer between January 1991 and June 1991. According to the record, appellant sold between one-half and one ounce of cocaine to the paid informer, Bill Vranesevich, and two undercover agents on January 30, 1991, February 6, 1991, February 14, 1991, June 14, 1991, and June 21, 1991.

Appellant argues that the verdicts on all charges should be set aside because he was entrapped as a matter of law. The basis for appellant's argument is that the behavior of the paid confidential informant, Bill Vranesevich, who contacted appellant within two weeks of appellant's release from a drug rehabilitation center, rose to the level of egregiousness to support entrapment as a matter of law. (Appellant's brief at 19.) In order to decide this issue, we must first review the law of entrapment in Pennsylvania, and, in particular, entrapment as a matter of law.

The defense of entrapment is codified at 18 Pa.C.S.A. § 313 and provides in pertinent part that:

> regarding the susceptibility of a recently recovering cocaine addict to participate in a cocaine transaction in exchange for cocaine as inducement as that issue related to the entrapment defense;
>
> V. Whether defendant should be granted a new trial on the basis that the trial court refused to admit expert testimony on the issues of the inadequacy and absence of investigative reports and absence of investigative techniques;
>
> VI. Whether defendant should be granted a new trial on the basis that the trial court erred by charging the jury on voluntary intoxication under the facts of this case;
>
> VII. Whether defendant should be granted a new trial on the basis that the court erred by giving the voluntary intoxication charge to the jury in response to the jury's only question during deliberations, when the jury only asked for the definition of entrapment.

**2.** 35 P.S. §§ 780–113(a)(16), (30).

**(a) General rule.**—A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by ...

. . . .

(2) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

**(b) Burden of proof.**—Except as provided in subsection (c) of this section, a person prosecuted for an offense shall be acquitted if he proves by a preponderance of the evidence that his conduct occurred in response to an entrapment.

The law of entrapment has evolved over the years in Pennsylvania. Today, Pennsylvania employs the so-called "objective" test for entrapment, whereas the federal courts utilize the "subjective" standard. The objective test was first enunciated by Mr. Justice Frankfurter in his concurrence in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (Frankfurter, J. concurring, joined by Harlan, J. Douglas, J. and Brennan, J.). As the notes to the Pennsylvania Standard Jury Instructions on the defense of entrapment explain:

Section 313 follows *Model Penal Code, Proposed Official Draft*, § 2.13 (1962) except that it eliminates a Model Penal Code requirement that the defense be tried by the court. Section 313 adopts the 'objective' approach to entrapment which is new to Pennsylvania law.... The old Pennsylvania law required that the defendant be an otherwise innocent person until the police or their agent, through creative activity, planted the idea to commit a crime in his mind and induced him to do so ... Crimes Code § 313 and Model Penal Code § 2.13 follow the minority view of the United States Supreme Court as articulated by Justice Frankfurter in his concurring opinion to *Sherman v. United States* ... This view—the objective approach—conceives the entrap-

ment defense as aimed at deterring police wrongdoing. The defense provides a sanction for overzealous and reprehensible police behavior comparable to the exclusionary rule. The focus of the defense is on what the police do and not on what kind of person the particular defendant is—whether he is innocent or predisposed to crime.

*Pa.Crim. Suggested Standard Jury Instructions*, Subcommittee Note § 8.313 (Pa.Bar Institute, 1985) (citations omitted). Further insight into the law of entrapment in Pennsylvania is provided by our supreme court in *Commonwealth v. Weiskerger and Commonwealth v. Clapps*, 520 Pa. 305, 554 A.2d 10 (1989), in which that court adopted our analysis of the objective standard which we articulated in *Commonwealth v. Jones*, 242 Pa.Super. 303, 363 A.2d 1281 (1976):

Thus, the test for entrapment has shifted in emphasis from a consideration of a particular defendant's readiness to commit crime, a subjective test, to an evaluation of the police conduct, an objective test, to determine whether there is a substantial risk that the offense will be committed by those innocently disposed. To determine whether an entrapment has been perpetrated in any particular case, therefore, the inquiry will focus on the conduct of the police and will not be concerned with the defendant's prior criminal activity or other indicia of a predisposition to commit crime.

*Weiskerger/Clapps, supra* at 311, 554 A.2d at 13, *citing Jones, supra* at 310–11, 363 A.2d at 1285.

This court addressed the objective standard in general and entrapment as a matter of law in particular in *Commonwealth v. Thompson*, 335 Pa.Super. 332, 484 A.2d 159 (1984). In *Thompson*, this court found entrapment as a matter of law in a case in which a young, attractive, female police officer exploited her femininity to lure Thompson into obtaining drugs for her, after chiding him repeatedly when he failed. *Id.* at 334–335, 484 A.2d at 160–162. Thompson was a middle-aged, married, male police officer with a mentally retarded daughter at home and was the subject of an undercover investigation. The female police officer conceded that

she engaged in an ongoing flirtation with Thompson, allowing him to kiss her, put his arms around her in public, and introduce her to his friends prior to his obtaining drugs for her. *Id.* at 341, 484 A.2d at 164. There was also uncontradicted testimony that all meetings and telephone calls were at the initiative of the undercover officer. *Id.* In finding entrapment as a matter of law, the *Thompson* court stated:

> The test for entrapment in Pennsylvania under section 313 is an objective one which 'focus[es] on the conduct of the police and will not be concerned with the defendant's prior criminal activity or other indicia of a predisposition to commit crime.' ... This statute represented a significant shift in Pennsylvania law, in that it rejected the then-existing use of a subjective test in entrapment cases, i.e., a test which focused on the defendant's predisposition to commit the crime.

> While the judicial focus in entrapment cases had changed, the case law has been consistent in Pennsylvania in holding that the determination of whether police conduct constitutes entrapment is for the jury, unless the evidence of police conduct clearly establishes entrapment as a matter of law.... Thus, after the defense of entrapment has been properly raised, *the trial court should determine the question as a matter of law wherever there is no dispute as to the operative facts relating to the defense.*

*Id.* at 340–341, 484 A.2d at 163–164 (citations and footnotes omitted) (emphasis added). *Accord, Commonwealth v. Mance,* 422 Pa.Super. 584, 588–590, 619 A.2d 1378, 1380 (1993), *aff'd,* 539 Pa. 282, 652 A.2d 299 (1995); *Commonwealth v. Phillips,* 439 Pa.Super. 428, 654 A.2d 591 (1995). From the foregoing, it is clear that we must begin our analysis of appellant's claim that he was entrapped as a matter of law by looking to the egregiousness of the police conduct in the instant case, and by examining the record to determine whether there exists a dispute as to the operative facts.

Initially, we note, as did the trial court, that there are many disputed facts in this case; however, our careful review of the record reveals that the *operative* facts are not in dispute.

"Operative facts" in the instant case are those that are necessary for appellant to prove by a preponderance of the evidence that he was entrapped. Under the objective test for entrapment, these would be facts that go to the course of conduct of a government officer or agent that " 'would fall below standards to which common feelings respond, for the proper use of government power.' " *Thompson, supra* at 342, 484 A.2d at 165, *quoting Sherman, supra* at 382, 78 S.Ct. at 825, 2 L.Ed.2d at 856. A brief summary of the operative facts in the instant case is therefore appropriate.

First, appellant had just completed a drug rehabilitation program less than two weeks before Vranesevich, the paid police informer, contacted him for the first time. Second, there is evidence unrefuted by Vranesevich that he was told about appellant's rehabilitation experience. Third, there is evidence uncontradicted by Vranesevich that Vranesevich appealed to his prior friendship with appellant, his need for a friend to see him through the death of his mother, and the sympathy engendered by his own admission that he had been through rehabilitation and was "clean" now in order to convince appellant's wife to relay a message to appellant. Fourth, Vranesevich did not contradict evidence that he used his need for money to help defray the medical expenses associated with his mother's terminal disease, and appellant's susceptibility to an offer of "a free high" at a point at which he was struggling to "stay clean," to induce appellant to sell him cocaine. Fifth, all of the transactions were at the instigation of Vranesevich; appellant did not contact the informer or the narcotics agents to set up additional purchases during the lengthy hiatus between February and June. Having briefly summarized the operative facts of the instant case, we next engage in a more detailed account of these facts as they are supported by the record.

According to Vranesevich's testimony, Vranesevich approached the Attorney General's office about becoming a paid informer in late October 1990 upon returning to western Pennsylvania after more than five years in Florida. (Notes of testimony, 2/17/93 at 555a, 575a–576a.) Vranesevich testified

that he and appellant had been as close as brothers from the mid–to–late–1970's until the early 1980's, having spent several years working together on a daily basis to rebuild appellant's vintage Camaro. They continued to do things together even after appellant had a one-night affair with Vranesevich's wife in the mid–1980's. (Notes of testimony, 2/17/93 at 574a–576a.) Vranesevich further testified that he was working on a number of cases for the government already when, on January 19, 1991, he decided to stop by appellant's family-owned business to see his old buddy and to introduce him to undercover narcotics agents James Liptak and Larry Fuksa. The agents were introduced to appellant as co-workers. (Notes of testimony, 2/17/93 at 534a, 566a, 583a.) Until Vranesevich brought appellant to the narcotics agents' attention on January 19, the agents did not know appellant. (Notes of testimony, 2/17/93 at 570a.) The events leading up to that first meeting on January 19th follow.

Appellant's wife, testifying for the defense, stated that Vranesevich called appellant at home on January 12, 1991, just twelve (12) days after appellant was discharged as an outpatient from Greenbriar Treatment Center. Appellant's wife answered the phone and told Vranesevich that she and appellant had just "been through a lot," and that she did not want Vranesevich or any of appellant's other former "drug buddies" to call him or bother him. In response, Vranesevich said that he, too, had been through a drug rehabilitation program, that he was clean, and that his only reason for calling was that his mother was dying of cancer and he needed a friend. Out of sympathy for Vranesevich, appellant's wife gave appellant the message. (Notes of testimony, 2/18/93 at 687a–689a.) Vranesevich testified that he "did not recall" having this telephone conversation with appellant's wife; however, when asked under oath if appellant's wife would be lying if she testified that such a conversation took place, Vranesevich responded: "I wouldn't call her a liar, no. I just don't recall that conversation happening." (Notes of testimony, 2/17/93 at 559a.)

Appellant also introduced evidence that his family had persuaded him to agree to the drug rehabilitation program, and

that after he was released, his wife and mother were actively monitoring his telephone calls and restricting his cash resources in an effort to help him stay "clean." (Notes of testimony, 2/18/93 at 670a–725a.) This testimony was corroborated by Vranesevich, who acknowledged that the family was screening appellant's calls at home and at work. (Notes of testimony, 2/17/93 at 563a.) Vranesevich persisted in calling, however, resorting to the use of an "alias" to get past the switchboard at appellant's place of employment. (Notes of testimony, 2/17–18/93 at 563a, 704a–708a.) Vranesevich testified that he and appellant worked out the use of the alias together; however, appellant testified that Vranesevich invented the alias, and that appellant went along with it. (Notes of testimony, 2/17–18/93 at 563a, 794a.) While the testimony conflicts, it is not testimony that goes to the type of inducement at issue in this case; therefore, it is not decisive on the issue of entrapment as a matter of law because it does not address an operative fact.

Both Vranesevich and appellant testified that drugs were not discussed at the first meeting between Vranesevich, the narcotics agents, and appellant on January 19, 1991. (Notes of testimony, 2/17–18/93 at 565a, 752a.) Rather, the main subject of discussion appeared to be Vranesevich's desire for a new kitchen for his recently purchased home, and his wish to have appellant, whose family owned a kitchen remodeling business, give him an estimate as to the cost of such a project. (Notes of testimony, 2/17/93 at 564a–567a.) [3] In addition, prior to the January 23, 1991 meeting, the first meeting at which drugs were apparently discussed, Vranesevich admitted that he had heard from both appellant and his wife that appellant had just been released from rehabilitation. (Notes of testimony, 2/17–18/93 at 558a, 568a, 754a.) Vranesevich testified that he did not feel the need to tell Agent Liptak that appellant had just been released from rehabilitation at the time because he thought appellant was "just kidding." (Notes of testimony

3. The only conflicting testimony on this issue was the discrepancy between what Vranesevich told Agent Liptak at the time of the first meeting, and what Vranesevich testified to under oath at trial. *See* notes of testimony, 2/17/93 at 565a–567a.

2/17/93 at 568a.) Agent Liptak testified, however, that Vranesevich told the agent "somewhere later on," but during the investigation, that appellant had recently been through treatment. (Notes of testimony 2/17/93 at 621a.) This testimony was uncontradicted by Vranesevich, who testified only that he "did not recall" whether he told the agent about appellant's attempted rehabilitation. (Notes of testimony 2/17–18/93 at 567a, 621a.) Nevertheless, the record is clear that Vranesevich asked appellant to sell him some cocaine, in exchange for which appellant could keep some for his own use. (Notes of testimony 2/17/93 at 541a.) Appellant had no prior criminal record, nor was his rehabilitation part of a plea agreement with the Commonwealth. From the foregoing, then, the record establishes that a government agent, taking advantage of his past close friendship with appellant, and playing upon appellant's sympathy, approached an individual who had just completed an extensive drug rehabilitation program for the purpose of inducing him to resume his use of drugs. We turn next to the nature of the drug transactions.

The five drug transactions in which appellant participated had the same pattern. First, appellant would meet Vranesevich and the two narcotics agents at an appointed rendezvous. Sometimes this was a restaurant or bar, sometimes a parking lot, and sometimes appellant's garage. The "buyers" would then give appellant between $1,000 and $1,900 to purchase the desired amount of cocaine, ranging from one-half to one ounce. Appellant would then leave the "buyers," having arranged a time and place to deliver the cocaine to them later in the day. Next, appellant would meet with his "source" to purchase the cocaine and would then go to his home to measure and "cut" the cocaine, taking one-sixteenth of an ounce for his own use. Finally, appellant would meet again with the three "buyers" to deliver the cocaine. (Notes of testimony, 2/17–18/93 at 537a–556a, 584a–605a, 755a–776a.)

While Vranesevich's testimony as to the exact location of these rendezvous conflicted at times with Agent Liptak's, his own, and/or appellant's, all agreed to the general format. In addition, testimony was uncontradicted that appellant had no

money with which to purchase drugs until it was furnished by the police because his family had him on an allowance of five dollars ($5.00) per day throughout this entire period. (Notes of testimony, 2/18/93 at 772a.) There *was* conflicting testimony as to whether Vranesevich had a side deal with appellant for a cut of the cocaine, and Vranesevich testified, once again, that he "did not recall" whether he ever used cocaine as part of the investigation of appellant. (Notes of testimony, 2/17–18/93 at 541a–542a, 561a, 570a, 757a, 761a–763a.) Nevertheless, none of the testimony regarding a "side deal" is central to the issue of inducement and is therefore not an operative fact. Finally, it was undisputed that all five transactions were at the instigation of the police; appellant made no effort to contact his "buyers" during the period from February to June 1991. (Notes of testimony, 2/17–18/93 at 633a–634a, 771a.) Having thus reviewed the operative facts of the instant case, we turn next to the operative facts of other Pennsylvania cases finding entrapment as a matter of law for guidance.

We have already reviewed the facts of *Thompson, supra,* a case in which an attractive female undercover police officer lured a fellow male officer into obtaining drugs for her in exchange for the promise of sexual favors. *Thompson, supra* at 333–40, 484 A.2d at 160–63. More recently, this court was confronted with a fact pattern similar to the instant case in *Commonwealth v. Wright,* 396 Pa.Super. 276, 578 A.2d 513 (1990), *appeal denied,* 526 Pa. 648, 585 A.2d 468 (1991), a case in which the defendant was found entrapped as a matter of law. While appellant argues that *Wright* is on all fours with the instant case, the Commonwealth argues that *Wright* is distinguishable. We agree with the Commonwealth; however, we find that the distinction is one of which the difference is to the benefit of appellant.

The *Wright* court, relying heavily on the analysis in *Thompson,* found entrapment as a matter of law under the following set of facts. In exchange for a probationary sentence, Ken Doran agreed to help gather information concerning drug dealing on the Penn State campus. Toward that end, Doran cultivated a friendship with Wright and, in reliance on that

friendship, asked Wright to purchase some marijuana for him "as a favor," alleging that Doran's work prevented him from purchasing it for himself. The police were fully aware of all of Doran's actions and made up the lies he told Wright. Wright received neither drugs nor money for his efforts, his only form of compensation being reimbursement for gas money and two cartons of lemonade. *Wright, supra* at 277–283, 578 A.2d at 514–516. In finding entrapment as a matter of law, the court focused heavily on the fact that Doran's testimony corroborated Wright's as to the operative facts, including Wright's reasons for engaging in the drug transactions. The court also noted the heavy degree of police involvement in fabricating lies about Doran's inability to purchase the drugs for himself. *Id.* at 277–279, 290–294, 578 A.2d at 514, 521–522.

In the instant case, we have an even more egregious set of uncontradicted "operative facts": a targeted "seller" released from an intensive drug rehabilitation program within two weeks; appeals to sympathy and friendship to convince appellant's wife to tell appellant that the informant wished to contact appellant; appeals to sympathy and susceptibility to drugs to induce appellant to return to drug use and to traffic in drugs; and no effort on the part of appellant to engage in drug transactions with the police officers during the lengthy hiatus between February and June. While the level of actual *police* involvement in creating the inducement is not as high in the instant case as it was in *Wright,* nevertheless, the case before the court presents exactly the kind of situation that the defense of entrapment was intended to address. Appellant argues, and we agree, that under the facts of this case, the conduct of the government agent described above rises to the level of outrageousness supporting our finding of entrapment as a matter of law.

As we have already noted, when § 313 was enacted, the legislature adopted the objective analysis of entrapment enunciated by Justice Frankfurter in his concurrence in *Sherman, supra.* Both the *Wright* and *Thompson* courts relied heavily on Justice Frankfurter's analysis in *Sherman.* It is therefore

instructive to review the facts of *Sherman* and the analysis of Justice Frankfurter with an eye toward the case before us.

*Sherman*, as in the instant case, involved a recovering drug addict. In *Sherman*, the informant met the petitioner at a doctor's office where both were being treated for narcotics addiction. A mild friendship based on their common problem developed. In time, the informant asked petitioner if he knew of a good source of narcotics, or if he could supply the informant with a source because the informant was not responding to the treatment. Despite the petitioner's attempts to avoid the issue, the informant persisted. Petitioner finally succumbed to the pressure of the informant's alleged suffering. *Id.* at 371, 78 S.Ct. at 820, 2 L.Ed.2d at 850–851. Subsequently, government agents observed petitioner give narcotics to the informant in return for money supplied by the government on three separate occasions. *Id.* The majority of the *Sherman* Court held that the petitioner had been entrapped as a matter of law. In so holding, however, the Court relied on the subjective test for entrapment; namely:

[Whether] 'the criminal design originate[d] with the officials of the government, and they implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce[d] its commission in order that they may prosecute.'

*Id.* at 372, 78 S.Ct. at 821, 2 L.Ed.2d at 851, *quoting Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 212, 77 L.Ed. 413, 417 (1932).

■ As noted *supra,* Pennsylvania no longer follows the subjective analysis of the *Sherman* majority; rather, it has adopted the objective analysis of the *Sherman* concurrence. As a result, the only issue is:

whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power.

*Sherman, supra* at 382, 78 S.Ct. at 825, 2 L.Ed.2d at 856 (Frankfurter, J. concurring). As Justice Frankfurter explained:

The courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the government to bring about conviction cannot be countenanced.

*Id.* at 380, 78 S.Ct. at 824, 2 L.Ed.2d at 855 (Frankfurter, J. concurring). That is surely our case today. It is hard to imagine what public policy is served by allowing the police or their agents to approach recovering drug addicts, newly discharged from rehabilitation programs to which they have submitted of their own free will, to lure them back into narcotics use.[4] As the *Sherman* concurrence stated:

The power of government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law. Human nature is weak enough and sufficiently beset by temptations without government adding to them and generating crime.

*Id.* at 384, 78 S.Ct. at 826–827, 2 L.Ed.2d at 858 (Frankfurter, J. concurring).

The Commonwealth argues that the instant case is controlled by *Commonwealth v. Manley,* 252 Pa.Super. 77, 380 A.2d 1290 (1977), a case in which the police had no knowledge of the informant's conduct. As our review of the record indicates, however, Agent Liptak admitted being told that appellant had recently completed a drug rehabilitation program. (Notes of testimony, 2/17/93 at 621a.) Furthermore, even if Agent Liptak did not know exactly how many times Vranesevich called appellant, or what the particular persuasive measures employed by Vranesevich were, nevertheless, we agree with the *Sherman* Court that the Commonwealth must take responsibility for the acts of its agents. Even using the

4. As previously noted, appellant had no prior convictions for drug trafficking and his rehabilitation program was not a part of a plea agreement with the government, in exchange for parole. On the contrary, the Commonwealth concedes that appellant went into rehabilitation at the behest of family members, who were doing everything in their power to help appellant overcome his addiction.

subjective test for entrapment, with its strong component of criminal predisposition on the part of the accused, the *Sherman* majority found that the petitioner had been entrapped as a matter of law when the government allowed its informant, as part of a plea agreement, to approach a recovering addict and urge him to return to his narcotics habit. Although the government in *Sherman* likewise claimed ignorance of the tactics used by its informant, the *Sherman* Court stated emphatically:

> The Government cannot disown [an informant] and insist it is not responsible for his actions. . . . [The informant] was an active government informer . . . In his testimony the [government] agent in charge of the case admitted that he never bothered to question [the informant] about the way he had made contact with petitioner. The Government cannot make such use of an informer and then claim disassociation through ignorance.

*Id.* at 373–75, 78 S.Ct. at 821–22, 2 L.Ed.2d at 852. Finally, § 313 itself demands such accountability, applying as it does to "[a] public law enforcement official *or a person acting in cooperation with such an official.*" 18 Pa.C.S.A. § 313(a) (emphasis added).

Lastly, we note that our finding of entrapment as to the first offense necessitates our finding entrapment as to all counts. As the *Sherman* Court stated:

> It makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement.

*Id.* The Pennsylvania Standard Jury Instructions echo this analysis:

> The defense [of entrapment] provides a sanction for overzealous and reprehensible police behavior comparable to the exclusionary rule.

*Pa.Crim. Suggested Standard Jury Instructions, supra* at Subcommittee Note § 8.313. As such, the fruit of the first

entrapment, like the fruit of an illegal search, cannot be utilized by the Commonwealth in its case against appellant.

We do not decide today that the police may never approach a person who has recently been released from a drug rehabilitation program; the Commonwealth may very well, in certain cases, be able to create a factual question for the jury on this issue. Entrapment as a matter of law is, ironically, fact specific. All we decide today is that, based upon the uncontroverted testimony at trial on the *operative* facts of this case, appellant was entrapped as a matter of law where: 1) a former very close friend; 2) appealing to the bonds of friendship and the sympathy engendered by the alleged impending death of his mother; 3) and claiming that he, himself, had been through rehabilitation and was now "clean"; 4) approached appellant repeatedly about selling drugs in exchange for which appellant could have a "free high"; 5) all the while knowing that appellant was just out of rehabilitation and that his family was doing everything in its power to help him remain drug-free. As the *Thompson* court, in reliance upon the *Sherman* concurrence, stated:

> Although entrapment necessarily must be decided on a case-by-case basis, impermissible activity may include '[a]ppeals to sympathy, friendship, the possibility of exorbitant gain and so forth.'

*Thompson, supra* at 343, 484 A.2d at 165 (*citing Sherman, supra*).

We do not, and are not asked to, decide today whether this particular appellant was ready to sell drugs when Vranesevich first approached him, nor whether he would have sold drugs to someone else if Vranesevich had not made the offer. As this court stated in *Commonwealth v. McGuire,* 339 Pa.Super. 320, 488 A.2d 1144 (1985):

> Pennsylvania's entrapment statute addresses the concern over 'unconventional' investigatory methods, and the *potentialities* inherent in these overreaching tactics. As such, the analysis only incidentally involves a particular defendant.

448

*Id.* at 328, 488 A.2d at 1149 (emphasis added). All we decide is that the government has a responsibility to ensure that the tactics used by its informants do not fly in the face of the goal of the state to reduce, not increase, illegal drug use, even if by only one person.

For the foregoing reasons, the judgment of sentence is vacated, and jurisdiction is relinquished.