**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Donald DIGGS, Defendant–Appellant.**

No. 92–3456.

United States Court of Appeals,
Tenth Circuit.

Nov. 4, 1993.

---

D. Blair Watson (Jackie N. Williams, U.S. Atty., with him on the brief), Asst. U.S. Atty., Wichita, KS, for plaintiff-appellee.

Jordan E. Clay (Stephen E. Robison with him on the brief), of Fleeson, Gooing, Coulson & Kitch, Wichita, KS, for defendant-appellant.

Before SEYMOUR, BARRETT and ANDERSON, Circuit Judges.

BARRETT, Senior Circuit Judge.

Donald Diggs (Diggs) appeals from the district court's judgment sentencing him to seven and one-half (7½) years imprisonment, five years of supervised release, and a $50.00 special assessment, following his conditional plea of guilty to Count I charging him with possession of cocaine base with intent to distribute on or about November 25, 1991, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The plea was conditioned upon Diggs' challenge to the district court's order denying his motion to dismiss Count I for alleged outrageous government conduct in conducting a "reverse sting" drug operation.

On appeal, Diggs argues that (1) the acts of government agents in conducting the "reverse sting" and inducing him to take possession of four ounces of crack cocaine constituted outrageous conduct requiring that the district court dismiss the indictment against him, and (2) the conduct of the government agents and the totality of the circumstances surrounding his arrest and the charges lodged against him required the district court to make a downward departure from the sentencing guidelines pursuant to U.S.S.G. § 5K2.0.

*Facts*

The facts recited here have been gleaned from the pleadings, the transcript of proceedings on Diggs' Motion to Dismiss which was heard on August 18, 1992, together with the transcript of the sentencing proceeding.

Detective Jerry W. Harper of the Wichita Police Department testified that the police became aware that Diggs had been involved in drug trafficking prior to June 18, 1991.

Prior to that date, a postal inspector in Kansas City opened a package containing a coffee maker with a quantity of cocaine installed therein. After removing a portion of the cocaine, the package was restored and permitted to continue its travel to a Wichita, Kansas, residence under surveillance. The package contained an electronic device intended to alert surveillance officers of its whereabouts. This package was removed from a Wichita residence by Diggs and a Wendell Jones during the early morning hours of June 18, 1991. Both entered a vehicle with the package, and police officers stopped the car. Diggs, a prominent Wichita attorney, had pencilled on the package "contents of package possible contraband for police, Donald Diggs" with his Bar number and the date. While no prosecution of Diggs was pursued, the incident attracted considerable media attention and alerted Wichita police to Diggs' possible involvement with drugs. Detective Harper testified that law enforcement officers thereafter learned that Diggs was a drug user.

Sedgwick County Sheriff's Department Detective Robert T. Benton testified that he saw television reports of the June 18, 1991, incident, and later learned that the district attorney had declined prosecution. In November of 1991, Benton was assigned to the Drug Enforcement Administration (DEA) task force in Wichita, Kansas. He testified that one Glen Smith, a government informant, told him that Diggs had a drug habit.

Smith had been previously arrested on May 28, 1991, for a serious drug offense. He had agreed to cooperate with the DEA task force in the hope that he would get a break on his sentence. Smith had a cocaine habit when arrested. Following his arrest, Smith informed the task force that he had sold cocaine to Diggs. He related that on one occasion, Diggs contacted him about buying 2.2 pounds of cocaine and when Smith quoted a price, Diggs stated that he could obtain it cheaper elsewhere. On the date of Smith's arrest, officers doing surveillance on his home observed Smith leave his home and walk a short distance southward where, in front of Diggs' home, he and Diggs conferred. Smith related to Detective Benton

that Diggs informed him that police had his (Smith's) home under surveillance and that he (Diggs) had really pulled off one in the postal case.

Detective Benton testified that he decided in early November, 1991, to set up a reverse sting operation out of Smith's house in order to target Diggs, predicated on Smith's statements that Diggs had purchased cocaine from him and Diggs' comments about the postal case. Benton had been involved in narcotics investigation for five years and had set up ten or fifteen reverse stings, i.e., operations wherein the government offers to sell controlled substances to a targeted person or persons, rather than offering to purchase controlled substances from the targeted person or persons. In setting up the reverse sting, Detective Benton had no knowledge that Diggs had ever sold cocaine, but only that Diggs was attempting to acquire large quantities of cocaine. The task force did not have information as to what Diggs did with the cocaine after acquiring it. Benton had been told by Smith, however, that Diggs had a drug habit. Smith had disclosed that Diggs had purchased drugs from him and that Diggs had inquired about the price of a kilogram of cocaine.

Detective Benton determined that among the investigative options, he believed that the best course of action in the Diggs case was to have Smith contact Diggs and offer to sell a quantity of cocaine to him. Benton testified that he considered other options, but because the task force did not know of any cooperating individual (informant) who had purchased cocaine from Diggs, they would be unable to introduce an agent or informant to Diggs for the purpose of buying cocaine. Furthermore, because Diggs was practicing law from his residence, physical surveillance would likely not provide evidence of Diggs' illegal drug activities inasmuch as law officers could not discern Diggs' legal clients from his cocaine clients.

Thereafter, Benton, Detective Terry Parham and Wichita Police Department chemist Bryant made about four ounces of crack cocaine at police headquarters which were later released from police custody to Smith for purposes of the "reverse sting" investigation

of Diggs. The street value of the four ounces of crack cocaine was estimated at between $12,000 and $18,000.

For purposes of the "reverse sting" investigation of Diggs, Smith was outfitted with a cassette recorder used during at least three contacts Smith made with Diggs from Smith's house. Further, on two occasions contacts between Smith and Diggs were audio and video recorded. They were not of very good quality.

During their first meeting at Diggs' home, Smith informed Diggs that he had some crack cocaine for sale. Diggs stated that he wanted to buy an ounce of powder cocaine. Smith asked Diggs to come to his house on November 21 to do a drug deal. Diggs did not appear that day so on the evening of November 21, Smith phoned Diggs and asked him to come to his house. Diggs went to Smith's home. Smith showed Diggs the four ounces of crack cocaine and informed him that he had a small quantity of cocaine powder. Smith offered Diggs a price of $3,300 for the four ounces of crack cocaine, explaining that he had no outlet for it. There was considerable discussion about price.

On the evening of November 25, 1992, Smith and Diggs met again at Smith's home. This meeting was videotaped. Diggs had previously weighed the crack cocaine and insisted that the package was ten grams short of four ounces, or nearly one-quarter pound. Smith asked Diggs if he could "move" the crack cocaine. Diggs responded that he could move it quick. Smith then offered Diggs the crack cocaine for $3,100. Diggs responded that he did not have the money, but that he had a contact for sale of the crack cocaine named Huey Brown, a UPS supervisor, who was also known as Hymie Rosenthal. Smith had previously informed the officers that he had "fronted" a small amount of powder cocaine a week or two before with Diggs, and that Diggs still owed him $40.00.

After Smith quoted the price at $3,100, Diggs informed him that he would deliver $1,550 the following day. He also asked Smith to weigh him out an ounce and that he would bring $1,000 right back.

Diggs was arrested as he departed from Smith's house in possession of the crack cocaine. He thereafter informed the police that he intended to sell the crack cocaine to Harold Brown.

## Discussion–Disposition

### I.

■ Appellant Diggs argues that the acts of the government agents in conducting the "reverse sting" and inducing him to take possession of the four ounces of crack cocaine on November 25, 1991, constituted outrageous conduct requiring the district court to dismiss the Indictment against him.

■ We review this issue *de novo. United States v. Clonts,* 966 F.2d 1366, 1369 (10th Cir.1992); *United States v. Giles,* 967 F.2d 382, 386 (10th Cir.1992).

With the exception of *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), neither the Supreme Court or this court have ever reversed a conviction on the ground of outrageous governmental conduct. In *Jacobson,* the Court held that the prosecution, as a matter of law, failed to present evidence in support of the jury verdict that Jacobson was predisposed, independent of the government's acts, to violate the law by receiving child pornography through the mail. The court held that the government agents originated the criminal design, implemented in an innocent person's mind the disposition to commit a criminal act, and then induced the commission of the crime so that the government could prosecute. The court stressed the fact that the defendant was the target of 26 months of repeated government mailings and communications, which overbore the defendant's predisposition independent thereof. Other Supreme Court opinions are:

*Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) (held that even if a defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment); *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48

L.Ed.2d 113 (1976) (when government informer supplied heroin to defendant, no outrageous governmental conduct occurred); *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (no outrageous governmental conduct occurred when an undercover police officer supplied a necessary chemical to defendant to manufacture amphetamine); *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (entrapment occurs only when the criminal conduct was the product of creative activity of law enforcement officials; the fact that government agents merely afford opportunities or facilities for the commission of the offense does not constitute entrapment); *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) (in order to state a valid entrapment defense, a defendant must establish government inducement of the crime and his lack of predisposition to engage in the criminal conduct).

This court has never rendered an opinion holding that governmental conduct constitutes outrageous conduct. *Giles* (law officer placed an advertisement in a swingers' magazine directed at pedophiles which drew a response from defendant that he was having a sexual affair with an eleven year old girl; officer replied that he had similar interests and enclosed a nude photo of a small boy and girl and a videotape requested by defendant entitled "Miss Teenage Nude;" officer's actions were reasonable and taken out of concern for the young girl because defendant was predisposed to exploit young girls; not improper for officer to suggest the photographing and mailing by defendant of illegal activities suspected of having taken place in order to ferret out defendant's illegal activity); *Clonts* (undercover agent, at defendant's request, supplied 100 pounds of marijuana which defendant "fronted," contained in three suitcases which agent helped defendant place in an airplane compartment destined to be flown for sale); *United States v. Mosley,* 965 F.2d 906 (10th Cir.1992) (government did not create crime when undercover agent suggested that defendant purchase large quantities of cocaine after the defendant attempted to purchase marijuana; government agents must often play the role of criminals in order to apprehend criminals, and this role occa-

sionally entails unseemly behavior; challenged conduct must be shocking, outrageous and clearly intolerable); *United States v. Perez,* 959 F.2d 164 (10th Cir.1992) (argument that government decision to use a "reverse sting" operation constitutes outrageous governmental conduct is without merit; government need not have a reasonable suspicion of wrongdoing in order to conduct undercover investigation of a particular person; appellant was a willing buyer whose decision to purchase drugs was not implanted by government agents); *United States v. Esch,* 832 F.2d 531 (10th Cir.1987), *cert. denied,* 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242, and *cert. denied* 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988) (postal inspectors' participated in carrying out an undercover investigation of suspected sexual exploitation of children by establishing a postoffice box in Loveland, Colorado, for a fictitious organization known as "Love Land" and submitted a membership application to a suspected pedophile which resulted in meetings between Postal Inspector Carr and one Thomas Blackledge leading to arrest of defendants for sexual exploitation of children; agents did not provide any of the instrumentalities of the crime, nor did they induce the defendants to engage in any activity that they were not otherwise disposed to undertake); *United States v. Morales–Quinones,* 812 F.2d 604 (10th Cir.1987) (government agents related to the defendants that they were prospective employers who would pay a smuggler's fee for smuggling illegal aliens from Mexico to Albuquerque); *United States v. Cantwell,* 806 F.2d 1463 (10th Cir.1986) (government informant agreed to make his printing shop equipment available to defendants who furnished all supplies necessary to print counterfeit money; government conduct here had no role in inducing the defendants to become involved in the counterfeiting scheme); *United States v. Martinez,* 749 F.2d 601 (10th Cir.1984) (special agent for the Department of Agriculture engaged in a wide-ranging undercover investigation of abuse of the food stamp program in Albuquerque, New Mexico, and sold food stamps to the defendants in exchange for heroin; offering to sell the food stamps at a substantial discount was not outrageous conduct); *United States v. Lam-*

*binus,* 747 F.2d 592 (10th Cir.1984), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985) (in food stamp prosecution, government undercover agent targeted defendant and traded food stamps worth substantially more than the items furnished by the defendant); *United States v. Warren,* 747 F.2d 1339 (10th Cir.1984) (postal inspectors, acting undercover, prepared phony accident reports and traffic tickets and contacted defendant physician who submitted false medical reports to the inspectors' insurance company; inspectors' fabrications did not induce the defendant to commit insurance fraud); *United States v. Gamble,* 737 F.2d 853 (10th Cir.1984) (same); *United States v. Salazar,* 720 F.2d 1482 (10th Cir.1983), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985) (agents offered to sell food stamps to defendant); *United States v. Monaco,* 700 F.2d 577 (10th Cir.1983) (agents encouraged informant to engage in criminal acts of prostitution in defendant's parlor and allowed her to use marijuana and cocaine and to operate her own house of prostitution); *United States v. Spitz,* 678 F.2d 878 (10th Cir.1982) (government agents supplied illegal chemical precursor of methamphetamine to defendant); *United States v. Szycher,* 585 F.2d 443 (10th Cir.1978) (agents agreed to pay informer $300 for each person he could "get into a cocaine situation" and agents pressured the defendant to purchase cocaine from them); *United States v. Spivey,* 508 F.2d 146 (10th Cir.), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975) (informer invited defendant to live with him and "held pot parties" for defendant and neighbors; defendant sold heroin to customers obtained for him by the informer).

■ While the defense of entrapment looks to the state of mind of the defendant to ascertain whether he was predisposed to commit the offense charged, the defense of outrageous conduct looks at the government's actions. In *Mosley,* we stated that each outrageous conduct case must be resolved on its own particular facts, and the totality of those facts and circumstances must be shocking, outrageous, and clearly intolerable so as to violate fundamental fairness or shock the universal sense of justice. 965 F.2d at 910. And in *Clonts,* we observed

that to reach this extreme, the government must engineer and direct the criminal enterprise from beginning to end. 966 F.2d at 1369.

In the instant case, the government did not manufacture a new crime. Instead, it interposed itself in Diggs' ongoing criminal activity in drug trafficking. The record shows that Diggs had been involved in drug trafficking with informer Smith and others prior to November of 1991. In June of 1991, Diggs was in possession of a package of cocaine which had been shipped under postal surveillance. Smith had previously sold cocaine to Diggs. While the government did provide the crack cocaine and agreed to front it to Diggs at a low price, it was Diggs who made the contact with a buyer for a quick sale. The entire undercover contact between Smith and Diggs involved only a few contacts over a period of six days from November 19 to November 25, 1991.

■ Under the above circumstances, we cannot hold that the government's conduct was so outrageous that "due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43. It is not outrageous for the government to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity. *Mosley,* 965 F.2d at 911; *Cantwell,* 806 F.2d at 1468–69 & n. 3. In order to induce a suspect to repeat, continue, or expand criminal activity, the government can suggest the illegal activity. *United States v. Biswell,* 700 F.2d 1310, 1313 (10th Cir.1983) (government agent suggested selling food stamps).

## II.

Diggs contends that the conduct of the government agents and the totality of the circumstances surrounding his arrest and the charges lodged against him required the district court to make a downward departure from the sentencing guidelines pursuant to U.S.S.G. § 5K2.0.

The Policy Statement attendant to § 5K2.0 relating to "Grounds for Departure" states in

part that "Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." In *Stinson v. United States,* ── U.S. ──, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993), the Supreme Court held that the principle that the Guideline Manual is binding on the federal courts applies as well to policy statements.

In *Clonts,* 966 F.2d at 1370–71, we held that we review the application of the sentencing guidelines for errors of law, while factual determinations made by the trial court are reviewed for clear error. *See also United States v. Shewmaker,* 936 F.2d 1124 (10th Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992).

This court recently reiterated the rule of this circuit that this court does not have jurisdiction to hear a defendant's appeal from the district court's discretionary refusal to depart downward from the Sentencing Guidelines. *United States v. Youngpeter,* 986 F.2d 349, 355 (10th Cir.1993), citing *United States v. Davis,* 900 F.2d 1524, 1529–30 (10th Cir.), *cert. denied,* 498 U.S. 856, 111 S.Ct. 155, 112 L.Ed.2d 121 (1990). See also, *United States v. LeRoy,* 984 F.2d 1095, 1096 (10th Cir.1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 99, 126 L.Ed.2d 66 (1993); *United States v. Pace,* 981 F.2d 1123, 1134 (10th Cir.1992), *cert. denied,* ── U.S. ──, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993); *United States v. Roberts,* 980 F.2d 645 (10th Cir. 1992).

The trial court pointed out during the sentencing proceedings that Diggs was not only a lawyer, but that he held Masters and Doctorate degrees in Education and that it was clear to the court from the videotapes that Diggs was not negotiating with Smith for the crack cocaine just to feed his own habit but rather to sell it to Huey Brown who was likely to distribute it. (R., Vol. III, Tab 94, pp. 11, 23–24).

At the sentencing proceeding, Diggs informed the court that he did possess the cocaine in this case with intent to distribute it but he believed that he was picked out through some type of vindictive prosecution. *Id.* at 4. When the district court advised him that he could assert a defense of vindicative prosecution, Diggs declined the invitation, acknowledging that he was guilty of the offense charged and that he knowingly, willingly, intelligently and voluntarily entered his guilty plea. *Id.*

**AFFIRMED.**