1997-NMSC-040

945 P.2d 957

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Vincent VALLEJOS, Defendant–Petitioner.**

No. 23775.

Supreme Court of New Mexico.

July 28, 1997.

T. Glenn Ellington, Chief Public Defender, Bruce Rogoff, Appellate Defender, Santa Fe, for Petitioner.

Tom Udall, Attorney General, Joel Jacobsen, Joan M. Waters, Assistant Attorneys General, Santa Fe, for Respondent.

Rothstein, Donatelli, Hughes, Dahlstrom, Cron & Schoenburg, LLP, Mark H. Donatelli, Santa Fe, Stout & Winterbottom, Michael Stout, Roswell, Michael W. Lilley, Las Cruces, for Amicus Curiae New Mexico Criminal Defense Lawyers Association.

## OPINION

MINZNER, Justice.

1. Defendant Vincent Vallejos was convicted for possession of a controlled substance under NMSA 1978, § 30–31–23 (1989), after he bought a quantity of crack cocaine from an undercover police officer during the course of a "reverse sting operation." On review by the Court of Appeals, Vallejos claimed, *inter alia,* that the trial court erred in ruling that there was no objective entrapment as a matter of law and in refusing to instruct the jury on objective entrapment. *See State v. Vallejos,* 1996 NMCA 086, ¶ 2, 122 N.M. 318, 320, 924 P.2d 727, 729 (Ct.

App.), *cert. granted,* 122 N.M. 112, 921 P.2d 308 (1996). The Court of Appeals affirmed the conviction and held, *inter alia,* that "predisposition generally still has a place in the New Mexico law of objective entrapment," 1996 NMCA 086, ¶ 1, 122 N.M. at 320, 924 P.2d at 729, and that proper police standards are to be determined by the trial court as a question of law. We granted certiorari to consider whether the jury or the trial court should determine proper police standards and whether predisposition has a role in objective entrapment.

2. The judgment of the Court of Appeals is affirmed in part and reversed in part. While we affirm Vallejos's conviction, we hold that when a defendant asserts the defense of objective entrapment, the factfinder decides whether police conduct created a substantial risk that an ordinary person would have been caused to commit the crime (a factual issue) and that the trial court decides as a matter of law whether police conduct exceeded the standards of proper investigation (a normative[1] issue). We also hold that in the context of the factual inquiry, a defendant's predisposition is not relevant; however, in the context of the normative inquiry, if a defendant raises the issue of predisposition, then the trial court may consider it. Furthermore, we hold that entrapment, whether subjective or objective, involves matters of due process under Article II, Section 18 of the New Mexico Constitution.[2]

## I. FACTS

3. The Albuquerque Police Department set up a reverse sting operation in an Albuquerque neighborhood believed to be a focal point for trafficking in illegal drugs. The District Court authorized a release of one

---

1. By 'normative' we mean "establishing or conforming to a norm or standard." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 598 (2d ed. 1995). A norm, in the sense intended here, is a "standard[ ] by reference to which behavior is judged and approved or disapproved. [It] is not a statistical average of actual behavior but rather a cultural (shared) definition of desirable behavior." 11 *The International Encyclopedia of the Social Sciences* 204 (David L. Sills ed. 1968). *See also* John David Buretta, *Reconfiguring the Entrapment and Outrageous Government Conduct*

*Doctrines* 84 Geo.L.J. 1945, 1949 (1996) ("[T]he entrapment and outrageous government conduct doctrines involve the normative issue of whether the government *should* have used inducements in the manner that it did.")

2. We note that this decision is based entirely on state constitutional grounds. *See Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983).

ounce 'of crack cocaine from the police department's evidence locker to be used in the operation. Officers posed as street sellers to potential buyers who were escorted to a nearby apartment where another officer posed as a drug dealer.

4. Vallejos approached an undercover officer on the street and asked if he was a police officer. When the officer responded that he was not, Vallejos offered to exchange a car stereo for a quantity of crack cocaine. The officer agreed and Vallejos left to retrieve the stereo. Upon Vallejos's return with the car stereo, the officer escorted him to the apartment where Vallejos showed the stereo to another officer and bargained for a larger amount of cocaine. The officer agreed to sell Vallejos the larger amount, exchanged the crack cocaine for the car stereo, and immediately arrested him for felony possession of a controlled substance.

## II. DISCUSSION

5. In *State v. Fiechter*, 89 N.M. 74, 547 P.2d 557 (1976), this Court adopted the subjective standard in cases of entrapment. Under ·this standard, "the focal issue is 'the intent or predisposition of the defendant to commit the crime.'" *Id.* at 77, 547 P.2d at 560 (quoting *United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973)). Subjective entrapment occurs "when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells v. United States*, 287 U.S. 435, 442, 53 S.Ct. 210, 212–13, 77 L.Ed. 413 (1932), *quoted in Fiechter*, 89 N.M. at 76, 547 P.2d at 559. If a defendant was predisposed to commit the crime and the police merely gave the opportunity to commit the crime, then the subjective defense fails. This was the state of entrapment law in New Mexico prior to *Baca v. State*, 106 N.M. 338, 742 P.2d 1043 (1987).

### A. Recognition of Objective Entrapment in *Baca v. State*

6. In *Baca*, 106 N.M. at 340, 742 P.2d at 1045, we recognized the defense of objective entrapment to compensate for a critical shortcoming of the subjective entrapment defense. Under the rule in *Fiechter*, a predisposed defendant who was merely given the opportunity to commit the crime by the police could not successfully assert the defense of entrapment; he or she could not assert the defense even if police conduct either exceeded the standards of proper investigation or would have ensnared one who was *not* predisposed. In *Baca*, we retained the subjective defense as articulated in *Fiechter*, supplemented it with the objective defense, and allowed defendants to assert either or both:

[A] criminal defendant may successfully assert the defense of entrapment, *either* by showing lack of predisposition to commit the crime for which he is charged, *or*, that the police exceeded the standards of proper investigation, as here where the government was both the supplier and the purchaser of the contraband and defendant was recruited as a mere conduit.

106 N.M. at 341, 742 P.2d at 1046.

7. While *Baca* succeeded in establishing an appropriate remedy where "police exceeded the standards of proper investigation," *id.*, it left a number of questions unanswered. First, it provided no guidance as to the content of the standards of proper police conduct in undercover operations other than that police should not instigate crime by setting up "circular transactions." *State v. Sheetz*, 113 N.M. 324, 326, 825 P.2d 614, 616 (Ct.App.1991) (analyzing *Baca*). Second, it did not delineate relative functions of judge and jury in assessing police conduct. Third, it did not expressly address whether a defendant's predisposition is relevant when he or she asserts the objective defense, though it implied that it was not. *See Baca*, 106 N.M. at 340–41, 742 P.2d at 1045–46. And fourth, *Baca* did not address whether the defense of entrapment, either in its subjective or objective forms, raises issues of due process.[3] *Id.*

---

**3.** The facts in *Baca* did not raise all of these questions and the contours of the defense of objective entrapment were not well-defined at

that time—in 1987, very few jurisdictions had recognized the objective defense. *See* 106 N.M. at 340, 742 P.2d at 1045 (citing cases from four

8. Each of these unanswered questions now requires answering in order to place the law of entrapment in New Mexico on firmer ground. *See Vallejos,* 1996 NMCA 086, ¶ 1, 122 N.M. at 320, 924 P.2d at 729 (noting need for clarification); *cf.* Buretta, *supra* note 1, at 1947 (observing that the federal analogues of New Mexico's subjective and objective entrapment doctrines require clarification). We do so with the benefit of several Court of Appeals decisions since *Baca. See Sheetz,* 113 N.M. at 328–29, 825 P.2d at 618–19 (recognizing that objective entrapment involves the question whether police conduct "offends our notions of fundamental fairness"); *State v. Gutierrez,* 114 N.M. 533, 535–36, 843 P.2d 376, 378–79 (Ct.App.1992) (following *Sheetz* ); *State v. Sellers,* 117 N.M. 644, 647–48, 875 P.2d 400, 403–04 (Ct.App. 1994) (analyzing New Mexico objective entrapment jurisprudence and explaining a jury instruction proposed in *Sheetz* ).

B. Distinction between Factual and Normative Inquiries within Objective Entrapment

9. In *State v. Sainz,* 84 N.M. 259, 501 P.2d 1247 (1972)[4], an entrapment case rendered prior to *Baca,* this Court recognized that entrapment might occur in three distinct contexts:

> When the state's participation in the criminal enterprise reaches the point where it can be said that [1] except for the conduct of the state a crime would probably not have been committed or [2] because the conduct is such that it is likely to induce those to commit a crime who would normally avoid crime, or, [3] if the conduct is such that if allowed to continue would shake the public's confidence in the fair and honorable administration of justice, this then becomes entrapment as a matter of law.

*Sainz,* 84 N.M. at 261, 501 P.2d at 1249. The first of these describes subjective entrapment. *See, e.g., Fiechter,* 89 N.M. at 77, 547 P.2d at 560; *see also* UJI 14–5160 NMRA 1997, ¶ 3. Our Court of Appeals has characterized the second situation as objective entrapment. *See, e.g., Sellers,* 117 N.M. at 647–48, 875 P.2d at 403–04; *see also* UJI 14–5160, ¶ 4. The third scenario has also been implicitly recognized as objective entrapment. *See Baca,* 106 N.M. at 339–41, 742 P.2d at 1044–46 (reversing conviction where "police exceeded the standards of proper investigation" without examining what an ordinary person would have been caused to do); *Sheetz,* 113 N.M. at 328–30, 825 P.2d at 618–20 (quoting *Sainz* and reversing conviction where police tactics were found to "offend our notions of fundamental fairness").

10. While the law of entrapment in New Mexico is divided at present into subjective entrapment and two branches of objective entrapment, the distinctions between these varieties of the entrapment defense have not always been clearly recognized. *See, e.g., Gutierrez,* 114 N.M. at 535, 843 P.2d at 378; *Sheetz,* 113 N.M. at 329, 825 P.2d at 619. This case allows us the opportunity to bring clarity to the law of entrapment in New Mexico. We therefore now recognize that objective entrapment has two distinct components, one factual and the other normative.

11. Earlier New Mexico cases suggested that a successful objective entrapment defense involved police conduct that *both* exceeded the standards of proper investigation *and* created a substantial risk of ensnaring an ordinary person. *Gutierrez,* 114 N.M. at 535–36, 843 P.2d at 378–79 (stating that the court determines whether police conduct "offends our notions of fundamental fairness *and would thereby amount to* methods of persuasion which create a substantial risk that a reasonable person in defendant's cir-

states recognizing objective entrapment); *see also State v. Lee,* 229 Conn. 60, 640 A.2d 553, 563 n. 16 (1994) (listing seven additional jurisdictions that had recognized objective entrapment before *Baca* ).

4. We overruled *Sainz* in *Fiechter,* 89 N.M. at 77, 547 P.2d at 560, and adopted the subjective defense recognized in *Sorrells,* 287 U.S. at 442,

53 S.Ct. at 212. In *Sheetz,* 113 N.M. at 328, 825 P.2d at 618, the Court of Appeals speculated that in *Baca,* we "contemplated that the holding[ ] of *Sainz* ... concerning the objective view of entrapment, would once again become good law." To the extent that the tripartite conception of entrapment quoted herein reflects the holding of *Sainz,* we agree with the Court of Appeals.

cumstances would commit a crime he or she was otherwise not ready and willing to commit" (emphasis added)); *see also Sheetz*, 113 N.M. at 329, 825 P.2d at 617 (proposing jury instruction that combined element of unfairness with the question whether police created a "substantial risk that the crime would be committed by a reasonable person in defendant's circumstances who was not otherwise ready and willing to commit the crime"); *Sellers*, 117 N.M. at 647, 875 P.2d at 403 (following *Sheetz* and approving the instruction). Today, we recognize that *either* will suffice. That is, if a jury finds as a matter of fact that police conduct created a substantial risk that an ordinary person not predisposed to commit a particular crime would have been caused to commit that crime, *or* if the trial court rules as a matter of law that police conduct exceeded the standards of proper investigation, then criminal charges should be dismissed.

### 1. Factual inquiry

12. In the factual inquiry, the jury examines whether the police engaged in conduct creating a substantial risk that a person not predisposed to commit the crime would have been induced to commit it. The jury ignores the question whether police conduct exceeded the standards of proper investigation. The jury's task is to answer a purely factual, hypothetical, objective question. While this factual inquiry has been formulated in a variety of ways, *see, e.g., Vallejos*, 1996 NMCA 086, ¶¶ 9–22, 122 N.M. at 321–23, 924 P.2d at 730–32 (discussing jury instructions); *Sellers*, 117 N.M. at 647–48, 875 P.2d at 403–04 (same); *Sheetz*, 113 N.M. at 329, 825 P.2d at 619 (proposing jury instruction), the focus of the jury's attention in this inquiry is on the likely effect of police conduct on a hypothetical person not predisposed to commit the crime.[5]

13. In this factual inquiry, the defendant's predisposition plays no role whatsoever—this is the principal difference between this defense and the subjective entrapment defense. Taking into account a defendant's predisposition in this inquiry would blur the distinction between subjective and objective entrapment and undermine the rationale of *Baca. See*, 106 N.M. at 339–41, 742 P.2d at 1044–46; *see also People v. Holloway*, 47 Cal.App.4th 1757, 55 Cal.Rptr.2d 547, 550 (1996). The principal reason we recognized the objective defense was to provide an adequate remedy where the police acted improperly but the defendant was predisposed. *Baca*, 106 N.M. at 340, 742 P.2d at 1045. If police create a substantial risk that an ordinary person would have committed the crime, then due process is violated regardless of the defendant's predisposition to commit the crime.

14. The factual inquiry is conducted primarily by the jury. However, if the trial court finds that police conduct created a substantial risk that a person not predisposed to commit the crime would have been induced to commit it and that no reasonable jury could find otherwise, then a directed verdict for the defendant is proper.[6] On the other hand, as the Court of Appeals noted, if there is insufficient evidence to support a jury instruction on this question, then the trial court may refuse to issue a jury instruction. *Vallejos*, 1996 NMCA 086, ¶ 30, 122 N.M. at 325, 924 P.2d at 735; *see also State v. Gammill*, 102 N.M. 652, 656, 699 P.2d 125, 129 (Ct.App.1985).

### 2. Normative inquiry

15. Under certain circumstances, police conduct might exceed the standards of proper investigation even though it does not cre-

---

5. The element of unfairness in the instructions discussed in *Sheetz* and *Sellers* has been removed from the jury's factual inquiry. It is now incorporated into the trial court's normative inquiry.

6. Amici assert that the State should not be allowed to defeat a defendant's motion for directed verdict merely by challenging the credibility of the defendant without coming forth with an affirmative showing that there was no entrapment. They assert that this conflicts with the rule announced in *United States v. Bueno*, 447 F.2d 903 (5th Cir.1971), which, according to Amici, became the law of New Mexico in *Baca*. We decline to address this contention because questions of credibility are neither raised by these facts nor included in the issues on which we granted certiorari. *See State v. Vallejos*, No. 23,775, 122 N.M. 112, 921 P.2d 308 (N.M. August 26, 1996) (order granting certiorari).

ate a substantial risk that an ordinary person not ready and willing to commit a crime would be caused to commit one. This is one of the reasons for our recognizing the distinction between the factual and normative inquiries.[7] In *Sheetz*, for instance, the defendant alleged that "the informant ... gave [the defendant] free heroin until he was addicted and then played on [his] addiction to persuade [him] to purchase heroin and cocaine for an undercover police agent." 113 N.M. at 328–29, 825 P.2d at 618–19. The Court of Appeals found these tactics offensive to our shared notions of fundamental fairness. *Id.* We agree. As a Pennsylvania Court stated in a somewhat different factual context, "It is hard to imagine what public policy is served by allowing the police or their agents to approach recovering drug addicts, newly discharged from rehabilitation programs to which they have submitted of their own free will, to lure them back into narcotics use." *Commonwealth v. Lucci*, 443 Pa.Super. 431, 662 A.2d 1, 7 (1995). Our survey of entrapment law in this and other jurisdictions leads us to the inescapable conclusion that police on occasion have engaged in conduct that might not ensnare the ordinary person but nevertheless exceeds the standards of proper investigation and violates substantive due process. Such instances frequently involve a defendant with a history of illegal drug use. In such cases, the defendant should be able to show the full context of the claim of improper police conduct without losing the right to make the claim at all.

16. Under the normative inquiry, the trial court carefully scrutinizes both the methods and purposes of police conduct to determine whether police tactics "offend our notions of fundamental fairness," *Sheetz*, 113 N.M. at 329, 825 P.2d at 619, or are so outrageous that "due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1643. As the Court of Appeals stated in *Sheetz*, 113 N.M. at 327, 825 P.2d at 617, "[t]he determination of the proper standards of police investigation is a question of law and policy to be decided by the courts in the first instance."

17. State and federal courts have frequently said that police conduct violates due process when it is outrageous, *see, e.g., Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1642–43, offends notions of fundamental fairness, *see, e.g., Sheetz*, 113 N.M. at 329, 825 P.2d at 619, violates principles of fair and honorable administration of justice, *see, e.g., Sainz*, 84 N.M. at 261, 501 P.2d at 1249, or shocks the conscience, *see, e.g., Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). The phrases used by the United States Supreme Court, by our Court of Appeals, and by this Court are time-honored ways of describing what the concept of due process embodies. Nevertheless, none of them provide practical benchmarks against which a trial court may test an undercover operation, or other police conduct similar to an undercover operation, when a defendant contends he or she has been denied due process. In order to provide some benchmarks, we have surveyed the factors and criteria other jurisdictions use when a defendant raises the objective entrapment defense, the outrageous government conduct defense, or the due process defense.[8] We recognize two broad categories of impropriety: unconscionable methods and illegitimate purposes.

### a. Using Unconscionable Methods and Advancing Illegitimate Purposes

18. While police may engage in some degree of deception in their efforts to

---

7. The relation between subjective entrapment, the factual inquiry of objective entrapment, and the normative inquiry of objective entrapment might be graphically represented as three concentric circles with subjective entrapment in the smallest circle, the factual inquiry in the middle circle, and the normative inquiry in the largest circle. When police compel a non-predisposed individual to commit a crime, they have, of necessity, created a substantial risk that an ordinary person not ready and willing to commit a crime will be caused to commit one. And when police create such a risk, they exceed the standards of proper investigation. The outer circle captures those instances in which police act improperly, but have neither caused a non-predisposed person to commit a crime nor created a risk that one would do so.

8. We note that these three terms appear to overlap and that the nature of the defenses they identify in fact overlap. Nevertheless, the three defenses are not identical.

detect certain sorts of crime that are difficult to detect otherwise, police may not employ unconscionable methods in their attempts to ferret out crime. We find the following examples to be helpful as indicia of unconscionability: "coaxing a defendant into a circular transaction," *Gutierrez*, 114 N.M. at 535, 843 P.2d at 378 (following *Baca* and *Sheetz* ); *see also* UJI 14–5161 NMRA 1997; "[giving defendant] free heroin until he [is] addicted and then play[ing] on [his] addiction to persuade [him] to purchase heroin and cocaine for an undercover police agent," *Sheetz*, 113 N.M. at 328–29, 825 P.2d at 618–19; an extreme plea of desperate illness, *see Grossman v. State*, 457 P.2d 226, 230 (Alaska 1969); an appeal based primarily on sympathy or friendship, *see Holloway*, 55 Cal.Rptr.2d at 550; Wayne R. LaFave & Austin W. Scott Jr., *Substantive Criminal Law* § 5.2, 602 (1986); an offer of inordinate gain or a promise of excessive profit, *see Grossman*, 457 P.2d at 230; persistent solicitation to overcome a defendant's demonstrated hesitancy, *see People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 718, 378 N.E.2d 78, 83 (1978); the use of brutality or physical or psychological coercion to induce the commission of a crime, *see State v. Lively*, 130 Wash.2d 1, 921 P.2d 1035, 1045 (1996) (quoting *United States v. Bogart*, 783 F.2d 1428, 1435 (9th Cir.1986), *vacated on other grounds with respect to one defendant sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir.1986)); an offer to sell drugs to one in a drug rehabilitation program, *see Lucci*, 662 A.2d at 7; employment of contingent fee agreements with informants, by which a key witness has "what amounts to a financial stake in criminal convictions," *see State v. Glosson*, 462 So.2d 1082, 1085 (Fla.1985) (informant paid ten percent of civil forfeitures resulting from criminal convictions in cases where he was the prosecution's critical witness); "unjustified intrusion into citizens' privacy and autonomy," *see State v. Johnson*, 127 N.J. 458, 606 A.2d 315, 322 (1992); the inducement of others to engage in violence or the threat of violence against innocent parties, *see United*

States v. Archer, 486 F.2d 670, 676–77 (2d Cir.1973) (dicta); the use of provocateurs sent into political organizations to suggest the commission of crimes, *see LaFave & Scott* § 5.2, at 612; excessive involvement by the police in creating the crime, *see United States v. Mosley*, 965 F.2d 906, 910–12 (10th Cir.1992); the "manufacture [of] a crime from whole cloth," *United States v. Harris*, 997 F.2d 812, 816 (10th Cir.1993); and the " 'engineer[ing] and direct[ion of] the criminal enterprise from start to finish,' " *id.* (quoting *Mosley*, 965 F.2d at 911 (quoting *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983))).

19. Police also violate due process when they ensnare a defendant in an operation guided by an illegitimate purpose. "Illegitimate purpose" is not capable of being defined with great precision.[9] However, other courts have described improper purposes in a number of ways. In West Virginia, a court considers whether police have ensnared a defendant "solely for the purpose of generating criminal charges and without any motive to prevent further crime or protect the public at large." *State v. Houston*, 197 W.Va. 215, 475 S.E.2d 307, 322 (1996); *see also State v. Shannon*, 892 S.W.2d 761, 765 (Mo.Ct.App. 1995) (using similar language). The New York Court of Appeals has suggested that due process is violated when "the record reveals simply a desire to obtain a conviction . . . [rather than] to prevent further crime or protect the populace." *Isaacson*, 406 N.Y.S.2d 714, 378 N.E.2d at 83; *see also Baca*, 106 N.M. at 340, 742 P.2d at 1045; *State v. Buendia*, 1996 NMCA 027, ¶ 10, 121 N.M. 408, 411, 912 P.2d 284, 287 (Ct.App. 1996); *Lively*, 921 P.2d at 1048.

20. While the normative inquiry is most appropriately conducted by the court, the jury may resolve factual disputes where credibility is an issue or where there is conflicting evidence pertaining to what events transpired. When the trial court finds that police have used unconscionable methods or have advanced illegitimate purposes, criminal charges should be dismissed. This is an

---

**9.** As Aristotle noted in the *Nicomachean Ethics*, "[o]ur discussion will be adequate if it has as much clearness as the subject-matter admits of, for precision is not to be sought for alike in all discussions." Aristotle, *Nicomachean Ethics* (W.D. Ross trans.) bk. I, ch. 3, *reprinted in* 9 *Great Books of the Western World* (Robert Maynard Hutchins, ed. 1952).

extreme remedy for extreme government behavior. In formulating what we characterize as the normative inquiry, we have kept in mind the need to balance two competing legal and social values: "on the one hand, the necessity to detect criminal activity such as the sale of narcotics, prostitution, [illegal] gambling, and other consensual crimes," *Houston*, 475 S.E.2d at 314, and on the other hand, the need to prevent the government from engaging in conduct that is "patently wrongful in that it constitutes an abuse of lawful power, perverts the proper role of government, and offends principles of fundamental fairness," *Johnson*, 606 A.2d at 322.

21. In the normative inquiry, like the factual one, the question whether a given undercover operation is "poor police strategy or a misguided waste of taxpayer money," *Vallejos*, 1996 NMCA 086, ¶ 20, 122 N.M. at 323, 924 P.2d at 732, is beyond the scope of the inquiry. To pass judgment on the wisdom of such operations would exceed the proper function of the judiciary and be tantamount to a "chancellor's foot" [10] veto, *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644, over policy decisions constitutionally delegated to the legislative and executive branches of government. *See* N.M. Const. art. III, § 1. *Cf. Vallejos*, 1996 NMCA 086, ¶¶ 20–22, 122 N.M. at 323, 924 P.2d at 732. The evaluation of police conduct in the normative inquiry is strictly limited to determining whether due process was violated. The normative inquiry should not be used as a guise to legislate from the bench or to micro-manage police investigative procedures.

22. We agree with other courts that have recognized the due process basis for objective entrapment that the defense should be used sparingly and reserved for "only the most egregious circumstances," *Mosley*, 965 F.2d at 910, in recognition of the need to empower police with adequate tools to ferret out crime that is difficult to detect. *See State v. Agrabante*, 73 Haw. 179, 830 P.2d 492, 496 (1992); *Johnson*, 606 A.2d at 326; *Lively*, 921 P.2d at 1046; *Houston*, 475

S.E.2d at 314. By expressly recognizing due process constraints on police investigations, we do not intend to preclude the police from, for instance, "play[ing] the role of criminals in order to apprehend criminals," *Mosley*, 965 F.2d at 910, participating in a crime they are investigating, *see id.*, or using deception to gain the confidence of suspects, *see Holloway*, 55 Cal.Rptr.2d at 550; *see also Lively*, 921 P.2d at 1045. The due process principles embraced today are not intended to hamper enforcement of the law, but, rather to help ensure that proper means are employed and that citizens' confidence in the "fair and honorable administration of justice" is not shaken. *Sainz*, 84 N.M. at 261, 501 P.2d at 1249.

b. The Role of Predisposition and the Relevance of a Defendant's Particular Circumstances in the Normative Inquiry

23. Amicus has argued that a "defendant's predisposition is not an element of the objective entrapment defense but evidence of [his or her] individual circumstances, if presented by the defendant, may be relevant to show how the police exceeded standards of proper investigation." We agree. In *Baca*, we intended to distinguish cases in which the defendant's character or predisposition was key to the entrapment defense, from cases in which the government's conduct was key. In this opinion, we intend to distinguish further those cases in which the police exceed proper investigative standards by engaging in conduct that might lead a reasonable person to commit the crime, from those cases in which police exceed proper investigative standards in other ways. Amicus has argued that evidence of a defendant's circumstances "may be relevant to show how police exceeded standards of a proper investigation but may not be used to excuse police misconduct." We agree. In the latter group of cases, for example, evidence of a defendant's addiction may be relevant to the trial court in evaluat-

---

**10.** Garner defines "chancellor's foot" as "inequitable variability in court rulings." Garner, *supra* note 1, at 109. "John Selden, the seventeenth-century barrister, said, 'Equity is a roguish thing, for law we have a measure to know what to trust to. Equity is according to the conscience of him who is Chancellor as it is larger or narrower so is equity. 'Tis all one as if they should make the standard for the measure we call a foot to be the *Chancellor's foot.*'" *Id.*

ing police conduct in the course of what we have characterized as the normative inquiry.

24. In separating what we have characterized as the normative and factual inquiries, we have attempted to separate classes of cases grouped under the heading of objective entrapment. As illustrated by comparing paragraph 4 of UJI 14–5160 and UJI 14–5161, however, the essential elements of these classes vary more than one would expect from their association under the single heading, "objective entrapment."

25. In this opinion we have emphasized that a defendant's predisposition plays no role in the factual inquiry conducted by a jury pursuant to paragraph 4 of UJI 14–5160. The same is true of the class of cases represented by UJI 14–5161, and illustrated by *Baca*, the so-called "circular transaction" cases. However, a defendant's circumstances, including addiction, may be taken into account during the normative inquiry. Because consideration of a defendant's circumstances is potentially prejudicial, we further limit the use of evidence of defendant's circumstances to those cases in which defendant raises, in the course of the normative inquiry, the issue whether, given his or her circumstances, the police used unconscionable methods or advanced illegitimate purposes. Once defendant raises the issue of his or her own circumstances, then the State may respond as necessary to explore the question whether the police engaged in objective entrapment.

26. We emphasize that, notwithstanding the differences among classes of objective entrapment, there is an analytic similarity. In none of these categories would a defendant's predisposition bar the defense. The classes are also similar in that they represent violations of due process under Article II, Section 18 of the New Mexico Constitution.

## C. Due Process

27. The State argues that the doctrine of separation of powers precludes this Court from issuing "rules governing the operations of another branch of government," (Resp. to Amici at 17), and that "[t]he only legitimate basis for the entrapment defense lies in stat-

utory construction," (*id.* at 21). We disagree with both of these propositions.

28. In past decisions of this Court and the Court of Appeals on objective entrapment, there have been intimations that the defense of objective entrapment raises issues of substantive due process. In *Baca*, we reversed the defendant's conviction because we found that police conduct "exceeded the standards of proper investigation." 106 N.M. at 340–41, 742 P.2d at 1045–46. In *Sheetz*, our Court of Appeals reversed a conviction and remanded for factfinding where the defendant alleged that police engaged in "tactics [that] offend our notions of fundamental fairness." 113 N.M. at 329, 825 P.2d at 619. In *Gutierrez*, that Court echoed the language of *Sheetz*. Compare *Gutierrez*, 114 N.M. at 536, 843 P.2d at 379 *with Sheetz*, 113 N.M. at 329, 825 P.2d at 619.

29. Other states have explicitly recognized constitutional due process dimensions of entrapment. *See Munoz v. State*, 629 So.2d 90, 98–99 (Fla.1993) (recognizing that "egregious law enforcement conduct" should be evaluated under article I, section 9 of the Florida Constitution); *Johnson*, 606 A.2d at 320–22 ("explicitly" founding the entrapment defense as a matter of due process on article I, paragraph 2 of the New Jersey Constitution); *Houston*, 475 S.E.2d at 319 (recognizing that "egregious and reprehensible" government conduct violates notions of fundamental fairness mandated by "article three, section ten of the West Virginia Constitution"); *Isaacson*, 406 N.Y.S.2d 714, 378 N.E.2d at 82 (recognizing that article I, section 6 of the New York Constitution sets due process "boundaries of permissible police conduct").

30. The due process underpinnings of entrapment have also been recognized in the federal courts. In *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), Justice Frankfurter wrote that "[t]he power of government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law." *Id.* at 384, 78 S.Ct. at 826 (Frankfurter, J., concurring).

Such conduct, according to Justice Frankfurter, does "more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience." *Rochin,* 342 U.S. at 172, 72 S.Ct. at 209. In *Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1642–42, a majority of the Court acknowledged the principle but rejected its application. In a subsequent case discussing *Russell,* two concurring and three dissenting justices recognized the outrageous government conduct defense as a matter of Fifth Amendment due process, while a plurality of the Court rejected the defense. *See Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *id.* at 495, 96 S.Ct. at 1652 (Powell, J., with Blackmun, J., concurring); *id.* at 496–97, 96 S.Ct. at 1653–54 (Brennan, J., with Stewart and Marshall, JJ., dissenting). Since *Hampton,* most of the Circuit Court of Appeals have recognized the outrageous government conduct defense. *See United States v. Jacobson,* 916 F.2d 467, 469 (8th Cir.1990) (en banc), *rev'd on other grounds,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992); *United States v. Nichols,* 877 F.2d 825, 827 (10th Cir.1989); *United States v. Simpson,* 813 F.2d 1462, 1464–65 (9th Cir.1987); *United States v. Arteaga,* 807 F.2d 424, 426 (5th Cir.1986); *United States v. Kelly,* 707 F.2d 1460, 1468 (D.C.Cir.1983); *United States v. Capo,* 693 F.2d 1330, 1336 (11th Cir.), *modified on other grounds sub nom. United States v. Lisenby,* 716 F.2d 1355 (11th Cir.1983); *United States v. Myers,* 692 F.2d 823, 837 (2d Cir.1982); *United States v. Jannotti,* 673 F.2d 578, 607 (3d Cir.1982) (en banc); *United States v. Johnson,* 565 F.2d 179, 182 (1st Cir.1977). *But see United States v. Boyd,* 55 F.3d 239, 241 (7th Cir. 1995) (rejecting the doctrine); *United States v. Tucker,* 28 F.3d 1420, 1426–27 (6th Cir. 1994) (same).

31. Article II, Section 18 guarantees that "[n]o person shall be deprived of life, liberty or property without due process of law." N.M. Const. art. II, § 18. As the branch of state government responsible for interpreting the constitution, the judiciary has the authority and the duty to protect individuals from violations of rights guaranteed in our constitution. *See State v. Gutierrez,* 116 N.M. 431, 446, 863 P.2d 1052, 1069 (1993). "We think it implicit in a regime of enumerated privileges and immunities that the framers intended to create rights and duties and they made it imperative upon the judiciary to give meaning to those rights through judicial review of the conduct of the separate governmental bodies." *Id.* The right to substantive due process embodies principles of fundamental fairness and entitles every individual to be free from arbitrary or oppressive government conduct. *See Garcia v. LaFarge,* 119 N.M. 532, 541, 893 P.2d 428, 437 (1995). The doctrine of separation of powers does not preclude us in any way from recognizing a due process violation where police exceed the standards of proper investigation.

32. The State's contention that the entrapment defense must be based on legislative intent is equally unconvincing. In some states, and in the federal courts, subjective entrapment is analyzed as a matter of legislative intent. *See, e.g., Lively,* 921 P.2d at 1039–40; *Sorrells,* 287 U.S. at 448, 53 S.Ct. at 215; *Russell,* 411 U.S. at 428–31, 93 S.Ct. at 1641–42 (following *Sorrells* ). According to the United States Supreme Court, Congress did not intend to criminalize conduct that would not have occurred in the absence of government instigation, inducement, or enticement. This statutory intent rationale has met with considerable criticism. *See* Buretta, *supra* note 1, at 1954, 1955 n. 52 (discussing this rationale and listing cases and law reviews criticizing it). In contrast to the statutory basis for subjective entrapment, the companion defense variously referred to as the due process defense, *see Johnson,* 606 A.2d at 323, the outrageous government conduct defense, *see Houston,* 475 S.E.2d at 322, or the objective entrapment defense, *see Holloway,* 55 Cal.Rptr.2d at 550–52, is considered to be of constitutional dimension. *See, e.g., Hampton,* 425 U.S. at 495, 96 S.Ct. at 1652 (Powell, J., with Blackmun, J., concurring). That is, some jurisdictions regard subjective entrapment as a defense grounded in legislative intent while treating objective entrapment as a defense grounded in constitutional due process. One commentator has observed an inconsistency in this distinction:

It is left unexplained why part of the entrapment defense is of constitutional dimension, while another part is not, as if successfully inducing criminal conduct on the part of those not originally ready and willing to commit crime were somehow not outrageous.

... Entrapment should be squarely founded on the principle that the manufacturing of crime serves no legitimate purpose, and that where crime is manufactured, prosecution must be barred as a matter of due process.

Ted K. Yasuda, Note, *Entrapment as a Due Process Defense: Developments after Hampton v. United States,* 57 Ind.L.J. 89, 129 (1982). We agree that all forms of entrapment constitute violations of due process. We therefore conclude that principles of due process protected in Article II, Section 18 of the New Mexico Constitution are implicated whenever police exceed the standards of proper investigation, create a likelihood that an ordinary person will be ensnared, or actually ensnare such a person. *See* N.M. Const. art. II, § 18; *Sainz,* 84 N.M. at 261, 501 P.2d at 1249.

### D. Procedural Aspects

33. Prior to *Baca,* the entrapment defense had not been asserted frequently. Under today's decision, we anticipate that the defense will be asserted more frequently and for this reason we make the following comments about the procedural aspects of the defense.

34. As noted earlier, the defendant may assert either or both objective and subjective entrapment in defense of the charge. If a defendant believes that police conduct exceeded the standards of proper investigation, a motion to dismiss could be filed on the objective entrapment theory. After an evidentiary hearing similar to that conducted on a motion to suppress, the trial court would decide as a matter of law whether the standards were exceeded. If the motion were denied, the objective entrapment defense instruction (UJI 14–5160, ¶ 4) could be given, assuming the production of sufficient evidence to support the defense.[11]

### E. Application

35. Vallejos contends that the trial court should have either instructed the jury on objective entrapment or ruled that the police operation was entrapment as a matter of law and a violation of due process under the New Mexico Constitution. In analyzing these contentions, we ask first "whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined." *State v. Gomez,* 1997 NMSC 006, ¶ 19, 122 N.M. 777, 783, 932 P.2d 1, 7 (1997) (adopting the interstitial approach to interpretation of the state constitution). As a first step, we consider the outrageous government conduct defense as it has been articulated recently by the Tenth Circuit Court of Appeals. Next, we examine whether the trial court erred in refusing to issue to the jury an instruction on objective entrapment. Lastly, we consider whether police used unconscionable methods or advanced illegitimate purposes.

#### 1. Federal due process

36. In *United States v. Diggs,* 8 F.3d 1520 (10th Cir.1993), the Tenth Circuit Court of Appeals considered whether a government agent's contacting the defendant several times over the course of six days and selling him some cocaine constitute conduct "so outrageous that 'due process principles would absolutely bar the government from invoking judicial process to obtain a conviction.'" *Id.* at 1525 (quoting *Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1643). In concluding that these

---

11. It may be that the defendant would want the jury instructed on a subjective entrapment theory under UJI 14–5160, ¶ 3. For instance, assuming that the police knew that the defendant was an addict and sold heroin to the defendant which temporarily satisfied the defendant's craving, the jury could acquit if it found that this was more than "merely [giving] the defendant the opportu-

nity to commit the crime." *Cf. Sheetz,* 113 N.M. at 328–29, 825 P.2d at 618–19 (noting that knowledge of an addict's craving and sickness of withdrawal can lead to unfair methods of persuasion by the police). This result could occur notwithstanding that the defendant "was already willing to commit the crime ... before first being approached" by the police.

actions do not constitute outrageous government conduct, the court looked at "the totality of . . . facts and circumstances." *Id.* In particular, the court examined the defendant's criminal background:

> The record shows that Diggs had been involved in drug trafficking with informer Smith and others prior to November of 1991 [when government agents contacted defendant and sold drugs to him]. In June of 1991, Diggs was in possession of a package of cocaine which had been shipped under postal surveillance. Smith had previously sold cocaine to Diggs. . . .
>
> . . . It is not outrageous for the government to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity.

*Id.* at 1525. *But cf. Baca,* 106 N.M. at 340–41, 742 P.2d at 1045–46 (suggesting that the defendant's predisposition should not be used to show the acceptability of police conduct).

37. The conduct of the police in this case was less intrusive than the conduct of the agents in *Diggs.* In *Diggs,* a government agent initiated contact with the defendant, whereas in this case Vallejos "initiated the contact, broke it off, did what he wanted to do for a little while and came back, [and] re[-]initiated [contact]," (Tr. I–74 (16–25), *quoted in* State's Answer Br. at 1). In *Diggs* the agent repeatedly contacted the defendant over a six-day period before selling him cocaine, whereas in this case the contact between Vallejos and the police took place during a brief interval of time, perhaps an hour or less. Police conduct in this case does not rise to the level of outrageousness that violates due process under the Fourteenth Amendment.

### 2. State due process

■ 38. As a matter of state constitutional law, Vallejos's claims fare no better. When there is sufficient evidence to support a jury instruction, the jury decides whether police created a substantial risk that an ordinary person would have been caused to commit this crime. On the evidence in the record, no reasonable jury could find that police created such a risk. Vallejos initiated contact with the police, not the other way around. After leaving to retrieve a car stereo which he planned to trade for some crack cocaine, Vallejos re-initiated contact with police and then proceeded to negotiate for a larger amount of the drug. The ordinary person would not approach someone on the street, ask if he or she could buy some crack cocaine, leave to retrieve a stereo to trade for the cocaine, return to consummate the deal, and then negotiate for a larger amount. On the contrary, this case exemplifies what is ordinarily meant by "merely [giving] the defendant the opportunity to commit the crime." UJI 14–5160, ¶ 3. Under these circumstances, because there was insufficient evidence to support an objective entrapment instruction, we agree with the Court of Appeals that it was proper for the trial court to refuse Vallejos's requested instruction. *See Vallejos,* 1996 NMCA 086, ¶¶ 31, 33, 122 N.M. at 325, 924 P.2d at 734.

39. While the trial court might not have considered whether this reverse sting operation employed unconscionable methods or advanced an illegitimate purpose, there is no need to remand this case to that court because we have sufficient facts to conduct this inquiry. In any case, we would review de novo the trial court's conclusions in the normative inquiry.

■ 40. The methods used by police in the course of this undercover operation, at least insofar as they directly relate to Vallejos, were acceptable. The use of illegal drugs to set up the simulated transactions was proper and properly done. The cocaine was obtained from the police evidence locker pursuant to court order. There is no indication in the record that anyone, police or suspects, used illegal drugs during the course of the operation, though in some circumstances the use of illegal drugs by police agents might pass muster. The use of deception in maintaining assumed identities was likewise a proper use of police power in this case. There were no appeals to close personal friendship, offers of inordinate gain, persistent solicitation, use of brutality, inducement to commit acts of violence, excessive involvement, creation of new crime, or

any of the other indicia of improper methods discussed above.

41. The purposes behind this reverse sting operation were permissible, legitimate, and did not exceed the standards of proper investigation. When police sought court approval for the use of a quantity of crack cocaine for the reverse sting, they stated, "Law enforcement has been unable to effectively stop the supply of drugs to the street dealers in this area. Other traditional methods of narcotic investigations have not been successful in curtailing the drug trafficking in the area." There is no indication, other than Vallejos's unsupported assertions, to suggest that this operation was set up to create drug addicts. In the course of this operation, police arrested each suspect and confiscated the drugs immediately after each transaction. The purpose of this operation was clearly to reduce criminal activity in an area of Albuquerque known for rampant illegal drug trade. Therefore, we conclude that there was no violation of due process in this case.

## III. CONCLUSION

42. We hold that when a defendant asserts objective entrapment, his or her predisposition is irrelevant to the factual inquiry conducted by the jury. If a defendant asserts that police conduct created a substantial risk that an ordinary person would have been caused to commit the crime, then the trial court should submit this question to the jury if there is sufficient basis for issuing the instruction. UJI 14–5160, ¶ 4, generally captures the appropriate standard for the jury's inquiry.[12]

43. We also hold that in the normative inquiry conducted by the trial court, the defendant may raise the issue of his or her predisposition. While the State may not raise the issue of a defendant's predisposition in the factual inquiry, it may explore the predisposition issue in the course of the normative inquiry if the defendant raises it. If a defendant asserts that police either used unconscionable methods or advanced illegitimate purposes in the course of a police investigation, then the trial court should determine as a matter of law whether police conduct was proper or violated due process under Article II, Section 18 of the New Mexico Constitution. In addition, we recognize expressly that entrapment, whether in its subjective or objective form, is a matter of due process under Article II, Section 18 of the New Mexico Constitution.

44. We agree with the Court of Appeals that it is not error for a trial court to refuse an instruction asking the jury to determine whether police created a substantial risk that an ordinary person would have been caused to commit the crime where the defendant initiates contact with police agents disguised as street sellers of illegal drugs, asks if he can buy drugs, leaves to retrieve an item to be traded for drugs, re-initiates contact, and negotiates for a larger amount of the drug, even where the police agent with whom the defendant made initial contact lied about his status as a law enforcement officer to maintain his disguise.

45. Finally, we hold that since this reverse sting operation neither employed unconscionable methods nor advanced an illegitimate purpose the standards of proper investigation were not exceeded. Therefore, Vallejos was not entrapped, his right to due process of law under our state constitution was not violated, and his conviction is affirmed.

46. This decision shall be applicable to all cases pending trial or on appeal on the effective date of the decision and hereafter.

47. IT IS SO ORDERED.

FRANCHINI, C.J., and BACA, SERNA, and McKINNON, JJ, concur.

---

12. To make the objective/subjective dichotomy more clear, the Uniform Jury Instruction should probably provide for subjective entrapment that the State must prove the defendant "was already willing to commit the crime ... before first being approached by law enforcement officers ..., and that the law enforcement officials merely gave the *predisposed* defendant the opportunity to commit the crime." With respect to objective entrapment, the Instruction should probably provide that the state prove "law enforcement officers ... did not engage in conduct which *under the circumstances* created a substantial risk that an ordinary person *who was not otherwise ready and willing to do so* would have been caused to commit the crime."